21-2640-cv
*Billie R. Banks v. General Motors, LLC*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2022

(Argued: December 6, 2022      Decided: September 7, 2023)

Docket No. 21-2640

———————————————————

BILLIE R. BANKS,

*Plaintiff-Appellant*,

*v.*

GENERAL MOTORS, LLC; AKA GM Components Holdings, LLC; FKA Delphi
Automotive Systems, LLC; AKA Dph-Das, LLC; FKA General Motors
Corporation,

*Defendant-Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————

Before:      CHIN, CARNEY, and ROBINSON, *Circuit Judges*.

———————————————————

Appeal from a judgment of the United States District Court for the Western District of New York (Skretny, *J.*) dismissing plaintiff-appellant's claims that her employer subjected her to a hostile work environment, race and sex discrimination, and retaliation, in violation of federal and state law. The district court granted the employer's motion for summary judgment, dismissing plaintiff-appellant's hostile work environment and disparate treatment claims. Although the district court initially denied summary judgment as to plaintiff-appellant's retaliation claim, on the employer's motion for reconsideration, the district court dismissed the retaliation claim as well.

VACATED and REMANDED.

---

> JOSEPHINE A. GRECO, Greco Trapp, PLLC, Buffalo, New York, *for Plaintiff-Appellant*.
>
> REBECCA J. BENNETT (Monica L. Lacks and Samuel H. Ottinger, *on the brief*), Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Cleveland, Ohio, *for Defendant-Appellee*.
>
> GEORGINA YEOMANS (Christopher Lage, Jennifer S. Goldstein, Elizabeth E. Theran, Gail S. Coleman, *on the brief*), United States Equal Employment Opportunity Commission, Washington, D.C., *for Amicus Curiae Equal Employment Opportunity Commission*.

---

CHIN, *Circuit Judge*:

In this case, plaintiff-appellant Billie R. Banks, an African American woman, claims that her employer, defendant-appellee General Motors, LLC ("General Motors"), subjected her to a hostile work environment, race and sex discrimination, and retaliation at her place of employment, the General Motors plant in Lockport, New York. In the district court, Banks presented evidence that, for example: a manager called her a "dumb n****r" in front of other employees; racist and sexist words or material were displayed around the plant; sexist comments were directed at her; the Confederate flag was depicted on employees' vehicles and clothing; and nooses were displayed on three separate occasions near the workstations of Black employees.

Banks also presented evidence that when she was ready to return to work after a leave of absence, a General Motors psychiatrist denied her permission to return, opining that she did not have "the conflict resolution skills to handle th[e] environment" at the plant and explicitly referencing the complaints of discrimination she submitted internally as well as to the Equal Employment Opportunity Commission (the "EEOC"). J. App'x at 503. And she presented evidence that after her return to work, she was placed in a different

3

role where she did not have supervisory responsibilities and was assigned to work a less desirable shift.

Despite this evidence, the district court granted summary judgment in favor of General Motors, dismissing initially Banks's hostile work environment and disparate treatment claims and eventually her retaliation claim as well. Because we conclude that Banks presented sufficient evidence on the basis of which a reasonable jury could find in her favor on all three claims, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

## *BACKGROUND*

### I.    The Facts

The facts are construed, as they must be, with all reasonable inferences drawn in Banks's favor. *See Howley v. Town of Stratford*, 217 F.3d 141, 145 (2d Cir. 2000); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 710 (2d Cir. 1996).

Banks began her career at General Motors in 1985 as a security officer. After leaving to obtain a master's degree, she returned to General Motors

in 1996 and began working at the Lockport Plant near Buffalo, New York,[1] where she continued to work until the present litigation.[2] Banks has been promoted twice during her tenure at General Motors, most recently to the position of Site Safety Supervisor in 2006. Banks held this position until she was replaced in 2014 while on medical leave. She returned to work in October 2014 and took another medical leave in January 2016. Both medical leaves were for the purpose of recuperating from the stress, anxiety, and depression she incurred from working at the Lockport Plant. J. App'x at 555.

### A. Workplace Culture at the Lockport Plant

Banks presented evidence of inappropriate conduct directed at her as well as at others.[3]

---

[1] General Motors contends that it did not have control over the Lockport Plant from 1999 to 2009, when it was run by Delphi Automotive Systems, LLC ("Delphi"). Banks, however, contends that General Motors "spun off" parts of the Lockport Plant in 1999. Despite the name change, Banks reported to the same supervisors, her responsibilities remained the same, and the plant continued to design and manufacture the same automotive parts. J. App'x at 468. According to Banks's Counter-Statement of Contested Material Facts, General Motors Corporation and Delphi both declared bankruptcy in 2005, and General Motors, LLC, reacquired the plant in 2009. *Id.*

[2] Banks began her most recent period of disability leave in January 2016 and remains on disability leave to date. *See* Appellee's Brief at 8; Opposition to Motion to Stay at 4, *Billie R. Banks v. General Motors, LLC*, No. 21-2640 (2d Cir. Aug. 7, 2023).

[3] This conduct occurred even though General Motors maintained an anti-harassment policy that prohibited, *inter alia*, "racist . . . or sexist slurs," "derogatory or objectionable conduct," disrespectful "jokes, cartoons, pictures, [or] language," and "verbal or physical conduct of a sexual nature." J. App'x at 1545. The policy explicitly

5

### 1. *Incidents Directed Toward Banks*

Starting in 2002, Banks was subjected to a series of racially or sexually offensive incidents at the Lockport Plant. For instance, Banks was accused by a supervisor of engaging in disability fraud in 2002[4] and credit card fraud in 2007; was called a "dumb n****r" by a manager during a meeting with other employees in 2004; observed racist and sexist graffiti around the plant, including the word "n****r" and sexual slurs as well as sexually explicit pinup calendars and posters starting in 2006; and observed depictions of the Confederate flag on employees' vehicles and clothing starting in 2009. Also starting in 2009, at least three different employees directed sexually offensive comments toward Banks. One told her she was "looking good back there." *Id.* at

---

provides that employees who "use the 'N' word, or 'C' word in any of [their] work-related communications . . . [could] expect to lose [their] job." *Id.* at 1547. Employees were directed to report conduct that violated this policy to their immediate supervisor, personnel director, equal employment opportunity or human resources representative, or to "utilize appropriate and existing internal complaint procedures." *Id.* at 1545.

[4] In 2002, Banks was injured in a motor vehicle accident and was on disability leave for her injuries from May to September of that year. Upon her return, James Fennell, the Personnel Director, accused her of engaging in benefits fraud because her injury claim was purportedly inconsistent with her medical records. Fennell informed her that General Motors had engaged a private investigator to look into whether she had fraudulently claimed a disability and showed her photographs that the investigator had taken of a Black woman around Buffalo, including images of the woman unloading groceries, walking in the park, and carrying luggage at the airport. Banks disputed that she was the woman in the photos. Banks was terminated from her job based on these allegations of disability fraud but was eventually reinstated. J. App'x at 474.

6

302. Another, while looking at her breasts, asked, "Are you cold or just excited to see me?" *Id*. at 605-06.

In August 2013, after Banks dismissed an outside contractor for violating safety protocols -- a decision within her discretion as a Safety Supervisor -- Tom Rush, a manager, walked into her office with another colleague, began yelling at her, and shook a thick, rolled-up document threateningly in her face. Rush had neither overseen the contractor's work nor inspected the particular safety situation that had given rise to the dismissal. Several of Banks's colleagues, including some who were up to 50 feet away, overheard Rush, and one colleague was so concerned that he was prepared to step in to physically protect Banks from Rush. Rush's conduct was sufficiently intimidating that Banks withdrew her order for the contractor to vacate the premises. Though Banks complained to management about the incident and a subsequent investigation determined that Rush had acted inappropriately, Rush was never disciplined and the incident was not noted in his personnel file.

During a CPR training class in April 2015, the union safety representative leading the class used Banks as an example of an African American who, after using and overdosing on drugs at home, would be in need

7

of CPR. Banks asked the representative not use her as an example and subsequently complained to management, but the representative was not disciplined. During that same class, the union safety representative used an Asian American coworker as an example, directing the class to assume the coworker "gets electrocuted by his wok and rice flies everywhere." *Id.* at 489. Also in April 2015, a safety representative referred to absorbent materials used on the plant floor as "naps" and joked to Banks that another Black male employee used the materials for his hair.

On one occasion in June 2015, when providing feedback for a document prepared for an upcoming presentation, Banks explained that she had made several changes to make the document appear more professional. Banks's colleague, a White male, responded with an email that read: "Wate a minit. R U sayin us guys is unperfeshonal? I am as perfeshonal as rastlin. [Y]a know what I mean. WWF. Perfeshonal rastlin. Take that to the bank. Billie Bank! lol . . . (I couldn't resist) [sic]." *Id.* at 1636. Banks responded to the colleague to say she believed he was mocking her by using Ebonics, a vernacular associated by some with African Americans. *Id.*

8

In addition to these specific incidents, Banks routinely experienced insubordination in her role as a Safety Supervisor not experienced by her White colleagues. She was deprived of support staff while prior Safety Supervisors -- most of whom were White men -- had been given several direct reports. Her directives or assignments were often ignored, and she was routinely denied data or information she needed to prepare monthly safety presentations. During a safety training session in January 2013, a colleague called Banks an "idiot" in front of other employees. *Id.* at 575. During another training session in May 2013, the same colleague again called Banks an "idiot," told the attendees that she "doesn't know what the hell she's doing," and that she would "cost [General Motors] $7 million" in OSHA fees. *Id.* at 576. When Banks complained about these incidents, Mike Moresco, a human resources business partner and training manager, replied: "You know why they do this to you? . . . Because you are black and female." *Id.* at 220, 577.

### 2. *Incidents Involving Other Employees*

Other employees at the Lockport Plant were also subjected to sexually or racially offensive conduct. Several Black or female employees told Banks that they had specifically been subject to sexually offensive comments or

9

racial epithets. Black colleagues, for example, shared with Banks that they were called a "n****r" or "monkey" by White employees, and that "you hear comments of that nature so often that you don't report them." *Id.* at 540; *see also id.* at 598. Another Black employee was referred to as a "silverback" by a manager, an apparent comparison to a type of gorilla. *Id.* at 599. One Black employee reported that a White colleague referred to work product she considered to be poorly done as "n****rized," *id.* at 598, and another reported that he was called a "n****r" everyday, *id.* at 411. Of the approximately 180 salaried employees at the Lockport Plant, six were Black. Of those six, three complained to management about discrimination.

On three separate occasions from 2006 to 2017, Black employees reported that nooses had been placed directly at or near their worksites. The first noose incident occurred in 2006 when David Luchey, a Black male employee, reported finding a noose placed on his toolbox. The noose was approximately three feet long and was made of thick rope. The second noose incident occurred in July 2014 when Luchey again reported seeing a noose, this time hanging from a crane near the plant's weld shop. This noose was also made of thick rope and was hung approximately eight feet from the ground. Another Black colleague,

10

Al Burch, relayed the incident to Banks shortly after it happened, as she was on disability leave. The third noose incident occurred in December 2017 when Daniel Marsh, another Black colleague, reporting finding a noose placed on a "tugger," or a motorized vehicle, that he was assigned to use. *Id.* at 540. The tugger had been temporarily assigned to him as he was covering the shift of another colleague.[5] The noose was made of gray twine. Marsh filed a report and General Motors investigated the incident. *Id*. at 1841-54.[6]

In September 2014, Luchey reported finding a Black rescue dummy, which was used for safety training exercises, placed inside a "budda," another type of motorized vehicle used inside the plant. *Id.* at 539. Contrary to the usual practice, the rescue dummy was not wearing clothes besides a pair of tattered pants and was seated upright in the vehicle, as if to drive it around. Luchey reported the incident and alleged that the display referenced slavery. Banks and other employees learned of the incident shortly thereafter and similarly took offense. The record does not indicate the outcome of Luchey's complaint.

---

[5]    During the investigation, Anthony Cecconi, who is White, was questioned as the primary user of the tugger. He stated that he had made the noose as part of a Halloween decoration for his home. J. App'x at 1852-54.

[6]    Though the record is unclear as to the outcome of the investigation, Marsh received paid time off as a result of the incident. J. App'x at 609.

## B.   *Internal and EEOC Complaints*

After raising numerous concerns with the human resources department, Banks filed a formal internal complaint on September 16, 2013, with Awareline, a third-party reporting service utilized by General Motors (the "Awareline Complaint").[7]  The Awareline Complaint alleged that Banks had been subjected to race and sex discrimination and specifically detailed the incident involving Rush.  Awareline began its investigation into the matter on September 20, 2013, but closed the investigation a few months later.  Awareline did not interview or otherwise contact Banks.

On October 24, 2013, Banks filed her initial charge with the New York State Division of Human Rights and the EEOC alleging race and sex-based discrimination.  She amended the EEOC charge on December 9, 2013, and again

---

[7]     Banks's Awareline Complaint alleged that the discrimination was "evident by years of pervasive unprovoked insults, verbal attacks, intimidation and hostile aggression" over her 16-year career at General Motors.  J. App'x at 1584-85.  Banks noted that she had "become desensitized to the subtle discrimination" but that "the personal [e]ffect is simply too great to ignore because it causes me mental and physical distress." *Id*. at 1584.  She also alleged that this experience was not shared by White female employees at the plant, who she described as being "treated with respect and never approached in the hostile manner that I have experienced." *Id*.

on July 10, 2014.  The EEOC issued Banks a right-to-sue letter on August 19, 2014.

*See Banks v. General Motors*, *LLC*, No. 14-cv-970 (W.D.N.Y.), Dkt. 1-1.[8]

### C.     *Disability Leave and Return to Work*

On September 9, 2013, Banks began a period of disability leave to

recuperate from the stress she incurred from the hostile and discriminatory

environment at the Lockport Plant.[9]

#### 1.     *The Suspension of Disability Leave Benefits*

General Motors's policy governing disability leave provides that

employees are entitled to 100% of their salary (through a combination of

disability benefits and salary) for the first thirteen weeks of leave and 75% of

their salary for the following thirty-nine weeks.  On November 22, 2013 -- one

month after Banks filed her EEOC claim and ten weeks into her disability leave --

General Motors suspended her disability leave benefits without notice.  After her

---

[8]     In the right-to-sue letter, the EEOC made the following determination:  "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge." *Banks v. General Motors*, *LLC*, No. 14-cv-970 (W.D.N.Y.), Dkt. 1-1.

[9]     Banks has taken several medical leaves from her job.  The first, from May to June 2010, was due to stress and fatigue, after a plant doctor evaluating her reported that she exhibited signs of undergoing a heart attack.  The second, from April to June 2013, was for recovery after a back injury.  The third was from September 2013 to October 2014.  The fourth began in January 2016 and continues to the present.  J. App'x at 554-55.

benefits were suspended, Banks was unable to support her family, her mental health deteriorated, and she suffered panic attacks, headaches, insomnia, and digestive problems. During a check-in call with Susan Gouthro, the plant's personnel director, in December 2013, Gouthro commented that it must be "tough" for Banks that her "sick leave benefits [were] cutoff [sic]." J. App'x at 347.

General Motors justified the suspension of benefits on the basis that Dr. Jones, a psychiatrist retained by General Motors, had examined Banks on or about November 22, 2013, and had determined that she appeared fit for duty and had not submitted evidence supporting her continuing leaving of absence. Banks, however, contends that she did not speak with Dr. Jones until May 2014, during a conference call regarding her request to return to work. Banks successfully appealed the suspension of her benefits; the benefits were reinstated, retroactively, in two payments -- the first on January 31, 2014, and the other on February 15, 2014.

### 2. *The Delayed Return to Work*

In April 2014, Banks notified General Motors that she was ready to return to work. She provided a note from her treating psychiatrist and obtained approval from the plant doctor, Dr. Ulatowski, in compliance with the practice

14

she had followed when she returned from other periods of disability leave. Unlike for her prior leaves, however, this time General Motors required that she meet with Dr. Jones before it would approve her return to work.

Dr. Jones spoke with Banks over the phone several times starting in May 2014 but never met with her in person. During their first call, Dr. Jones asked Banks if she had ever been raped or sexually abused as a child, as he noted that "typically people who exhibit her symptoms have had that type of trauma." *Id.* at 503. When Banks replied that she had not and remarked that the question was inappropriate, Dr. Jones responded that her complaints of workplace discrimination were not sufficient to sustain a mental breakdown and that something in her family background must have caused her stress and anxiety. Banks told Dr. Jones that his inquiries were inappropriate as they did not bear on her ability to return to work.

Dr. Jones then remarked that he had reviewed Banks's file and doubted her readiness to return. He noted that Banks had filed EEOC, Awareline, and workers' compensation complaints (the last of which she had not filed) and remarked that she did not appear to have "the conflict resolution skills to handle th[e] environment" at the plant and that she "seemed to be emotional

15

[when] talking about the incidents." *Id.* at 503. Dr. Jones refused to approve her return to work.

Banks next spoke to Dr. Jones in September 2014. During that call, Dr. Jones commented that Banks had "lost" her EEOC, Awareline, and workers' compensation claims. *Id.* at 343. Acknowledging that General Motors had not "f[ound] anything," Dr. Jones approved Banks's return to work. *Id.*

### 3. *The Reassignment*

Several months into her disability leave, General Motors replaced Banks as a Safety Supervisor without her knowledge. General Motors maintained a policy whereby salaried employees on disability leave would not be replaced without approval by their manager and the appropriate human resources management team. But on January 29, 2014, four months after Banks began her disability leave, Gouthro approved the public posting of Banks's position without obtaining the requisite approval from the relevant human resources team. Moresco also sent a plant-wide email to salaried employees advertising the open position. Banks did not receive this email, despite being included in the plant-wide email distribution list. On March 29, 2014, Robert Duke, a White man, was hired to replace Banks as a Site Safety Supervisor. In his

16

new role, Duke was given fewer responsibilities and more support staff than Banks had received. Duke also received overtime pay when he worked at the plant outside of his scheduled shifts, which Banks had never received.

A few weeks later, Maureen Horten, the Corporate Human Resources Manager for Global Health and Safety, emailed Gouthro about "the situation," noting that "[i]t appears that a safety position was posted for Lockport" and that an "external candidate" had been hired. *Id.* at 1600-01. Expressing "surprise[] . . . that [she] was not aware of any posting or interview process" for Banks's Safety Supervisor role, Horten noted that Banks had just notified General Motors of her readiness to return and queried whether Gouthro was "aware of the situation we could be facing re [the posting]." *Id.* at 1600. Horten requested that Gouthro contact her so they could "talk through [the situation]." *Id.*

After Dr. Jones approved her return to work, Banks returned to the Lockport Plant in October 2014 but was reassigned to a Safety Representative role where she no longer had supervisory responsibilities and was instead assigned menial tasks. Gouthro announced the personnel change in a plant-wide email which stated that Banks was now "the off shift Safety Representative

17

supporting manufacturing operations on 2nd/3rd shift" and "the off shift Contact Person for Labor Relations." *Id.* at 1621. Though Banks received a small raise and her new position was of the same rank, she no longer had supervisory responsibilities, was given a different title, and was assigned to a less desirable shift.

Banks complained to management about her reassignment to a "non-value added position." *Id.* at 1710. As a Safety Representative, she no longer advised leadership about plant-wide safety concerns, was not involved in the development of business plans and safety metrics, did not participate in meetings with Safety Supervisors from other sites, and did not supervise other employees. And although she was nominally assigned to a position with Labor Relations, she received no training for the role, no access to necessary resources, and no assignments related to the position.

In particular, Banks protested that the reassignment interfered with her efforts to advance her career. During her tenure at General Motors, Banks had consistently sought opportunities for advancement. In 2011, she had been selected as a member of General Motors's "Talent Review" group, in which promising employees were selected to present their goals and accomplishments

18

to corporate management. *Id.* at 590. In December 2014, Banks was offered a temporary assignment at the General Motors plant in Grand Rapids, where she would gain "multiplant experience" that would enhance her advancement opportunities. *Id.* at 353. Banks responded that she "absolutely" wanted the position and began making travel arrangements. *Id.* One day before she was meant to leave, however, General Motors rescinded the offer without explanation.

After making further complaints about her new role, Banks was moved to a different shift and assigned some primary responsibilities. Six months after her return to work, she was reinstated to the first shift, the original shift she had worked prior to going on disability leave.

## II. Proceedings Below

Banks commenced this action on November 14, 2014, asserting claims of hostile work environment, race and sex-based disparate treatment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. L. §§ 290 *et seq.* (the "NYSHRL"), and 42 U.S.C. § 1981. Banks alleged that the conditions at the Lockport Plant created a hostile work environment so

19

severe or pervasive that it affected the conditions of her employment. She also alleged that the termination of her disability benefits, her delayed return to work, and her reassignment all constituted adverse actions relevant to her disparate treatment and retaliation claims.

On February 13, 2018, General Motors moved for summary judgment on all claims. On November 20, 2020, the district court granted summary judgment to General Motors on the hostile work environment and disparate treatment claims but denied summary judgment on Banks's retaliation claim based on the suspension of her benefits while on medical leave. *See Banks v. General Motors, LLC*, No. 14-cv-970S, 2020 WL 6827707 (W.D.N.Y. Nov. 20, 2020). As a threshold matter, the district court held that a number of the incidents Banks alleged to support her discrimination and retaliation claims were time barred. *See id.* at *11. As for Banks's hostile work environment claim, the district court held that no reasonable jury could find that the environment at the Lockport Plant was hostile to female or African American employees. *See id.* at *15-16. As to the disparate treatment and retaliation claims, the court found that Banks's reassignment was not an adverse employment action, and while her delayed return to work "might" constitute an adverse action, Banks had failed to

20

establish an inference of discrimination. *See id.* at \*14, \*17-18.  The district court held, however, that there was a genuine issue of fact as to whether General Motors committed an adverse action when, in contravention of company policy, it suspended Banks's benefits while she was on leave. *See id.* at \*16-17.

General Motors moved for reconsideration with respect to the retaliation claim, initially alleging newly discovered evidence as to Banks's disability benefits but later changing course and arguing that summary judgment was warranted to avoid a manifest injustice.  S. App'x at 64-67.  On September 23, 2021, the district court reversed itself and held that because Banks's disability benefits were eventually repaid, the suspension of the benefits was a "trivial harm" that was insufficient to support an adverse action finding. *See Banks v. General Motors, LLC*, 14-cv-970S, 2021 WL 4323909, at \*10 (W.D.N.Y. Sept. 23, 2021).  As a result, the district court granted the motion and dismissed the remaining claim.  Judgment was entered on September 24, 2021.

This appeal followed.

## DISCUSSION

We review a district court's decision to grant summary judgment *de novo*. *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).  In considering

21

a motion for summary judgment, the district court "must draw all inferences in favor of the non-moving party, and may affirm only if the record reveals no genuine issue of material fact for trial." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000); *see also* Fed. R. Civ. P. 56(a). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), and *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.")). Indeed, as we have recognized, "'clever men may easily conceal their motivations.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (quoting *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir. 1979)). Due to the "'elusive' nature of intentional discrimination," *id.* (citing *Texas Dept. of Cmty. Affs. v. Burdine*, 405 U.S. 248, 255 n.8 (1981)), plaintiffs must often "rely on 'bits and

pieces' of information to support an inference of discrimination," *id*. (citing

*Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998), *abrogated in part on other*

*grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).  Because of the

likelihood that "direct evidence of an employer's discriminatory intent will rarely

be found, 'affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'"  *Schwapp*,

118 F.3d at 110 (quoting *Gallo*, 22 F.3d at 1224).  The resulting "mosaic of

intentional discrimination," *Vega*, 801 F.3d at 86 (internal quotation marks

omitted), may be sufficient to show discrimination.  Nonetheless, even in the

discrimination context, a plaintiff must still present more than conclusory

allegations to survive a motion for summary judgment.  *See Chertkova v. Conn.*

*Gen. Life Ins. Co.*, 92 F.3d 81, 92 (2d Cir. 1996).

We first address the timeliness of Banks's claims before turning to

the merits.

I.      **Timeliness of Banks's Claims**

A.      *Applicable Law*

Under Title VII, individuals alleging discrimination must file a

charge with the EEOC within 180 days or, in states like New York that have local

23

administrative mechanisms for pursuing discrimination claims, 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-(e)(1); *see Vega*, 801 F.3d at 78-79. This statutory requirement "operates as a statute of limitations." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982). In *National Railroad Passenger Corp. v. Morgan,* the Supreme Court held that the word "practice" refers to "a discrete act or single 'occurrence,'" and that a "discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" 536 U.S. 101, 110-11 (2002). For plaintiffs alleging unlawful discrimination or retaliation, discrete actions such as "termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 114-15.

An exception to the 300-day rule applies, however, if the discrimination constitutes a "continuing violation." Under the continuing violation doctrine, if "'specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice,' a continuing violation may be found." *Van Zant*, 80 F.3d at 713 (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).

24

If a continuing violation is found, a court must then consider "all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Id.; see also Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *overruled on other grounds by Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015).

Claims alleging a hostile work environment require a different analysis than discrimination or retaliation claims because "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. Unlike discrete discriminatory or retaliatory actions, incidents that give rise to a hostile work environment "occur[] over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own." *Id*. The *Morgan* Court made clear that "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. So long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*.

The statute of limitations for claims brought under § 1981, as amended by the Civil Rights Act of 1991, is four years. *See Jones v. R.R. Donnelley*

25

*& Sons Co.*, 541 U.S. 369, 382 (2004).  Under the NYSHRL, claims must be filed within three years of the adverse employment action.  *See Van Zant*, 80 F.3d at 714; *Lore v. City of Syracuse*, 670 F.3d 167, 169 (2d Cir. 2012).  This three-year statute of limitations is tolled during the period in which a complaint is pending before the New York State Department of Human Rights or with the EEOC.  *See Esposito v. Deutsche Bank AG*, 07-cv-6722, 2008 WL 5233590, at *4-5 (S.D.N.Y. Dec. 16, 2008).

   **B.     *Application***

      As a threshold matter, the district court properly calculated the applicable limitations periods for Banks's claims.  The court found that the Title VII 300-day limitations period began on December 28, 2012, 300 days prior to October 24, 2013, when Banks filed her first EEOC complaint.  *Banks*, 2020 WL 6827707, at *11.  It found that the four-year limitations period for the § 1981 claims began on November 14, 2010, four years prior to November 14, 2014, when Banks filed her complaint.  *Id*.  For the NYSHRL claims, the court found that the three-year limitations period was tolled during the pendency of Banks's EEOC claim -- that is, from October 24, 2013, to August 19, 2014, when the right-

26

to-sue letter was issued -- and that the applicable time period began on January 20, 2011.  *Id.*

The district court dismissed certain of Banks's claims as untimely.  In particular, it concluded that claims based on "[f]ive key events" in 2002, 2004, 2006-09, and 2010 (two events) were untimely.  *Id*. at \*12.  It also held that Banks's claims based on graffiti found during her 2010 to 2012 safety inspections were time barred.  At the same time, the district court concluded that even the events predating the relevant limitations periods were timely for purposes of Banks's hostile work environment claims.  *Id.* at \*12-13.

First, as to the hostile work environment claims, we agree with the district court that the earlier incidents, that is, those that predate the applicable dates, may be considered with respect to the hostile work environment claims. *See Banks*, 2020 WL 6827707, at \*13; *Morgan*, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").  General Motors contends that Banks improperly relies on time barred incidents in support of her hostile work environment claim, but this argument is clearly contravened by the Supreme Court's teachings in

*Morgan*. Similarly, General Motors's emphasis on the fact that other Black or female employees were the subject of many of Banks's examples of discriminatory harassment is foreclosed by our precedents that make clear that a plaintiff need not be the victim of all discriminatory harassment relevant to her hostile environment claim. In any event, if incidents prior to the limitations periods are properly considered, Banks herself was indeed subjected to epithets.

Second, as to the disparate treatment and retaliation claims, there is no longer a timeliness issue for us to decide. As Banks makes clear in her brief on appeal, her disparate treatment and retaliation claims are based on the following actions, which occurred on the following dates:

- the suspension of her medical benefits on November 22, 2013;

- the delay in permitting her to return to work when she was ready in April 2014; and

- her reassignment to a different position in October 2014.

Appellant's Br. at 44-62. Because all of these events occurred after the relevant limitations dates, they are not time barred. While the district court referred to other specific events, such as the termination and restoration of Banks's employment in 2002, the withholding of staff support from 2006 to 2009, and the

28

withholding of air sampling data in 2010, Banks's appellate brief makes clear that she is not pursuing these actions as bases for her disparate treatment or retaliation claims. *Id.* at 44, 47, 48, 51, 54, 57. Rather, as discussed above, she is relying on them as background evidence and to support her hostile work environment claim.[10]

We now turn to the merits of each of Banks's claims.

---

[10] For similar reasons, we reject General Motors's contention that we disregard acts that occurred prior to October 2009, when it repurchased the Lockport Plant after selling it to Delphi in 1999. As a threshold matter, none of the incidents Banks relies upon to support her disparate treatment and retaliation claims occurred prior to 2009. As to her hostile work environment claim, Banks contends that the culture of hostility permeated the Lockport Plant despite the changes in ownership. Banks reported to the same supervisors, her responsibilities remained the same, and the plant continued to design and manufacture the same automotive parts during the relevant period.

Moreover, the record is unclear as to the relationship between General Motors and Delphi. Neither the district court nor General Motors addressed Banks's contention that Delphi was a "spin off" of General Motors, and both the district court's decision and General Motors's brief on appeal appear, at times, to conflate the two allegedly separate entities. *See, e.g.*, *Banks*, 2020 WL 6827707, at *1 (noting that "Defendant [General Motors] later promoted Plaintiff as a safety supervisor at [the Lockport P]lant," which indisputably occurred in 2006); Appellee's Brief at 2 (noting that "GM promoted [Banks] to the management team" at the Lockport Plant, which presumably refers to her 2006 promotion to Site Safety Supervisor, as her other promotion, in 1999 to the role of Divisional Suggestions Administrator, was to a non-managerial position). Because the district court did not consider whether General Motors was subject to successor liability for incidents that occurred between 1999 and late 2009, we remand with instructions to consider this issue in the first instance.

29

## II. The Hostile Work Environment Claim

### A. *Applicable Law*

To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must "produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz*, 202 F.3d at 570 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). Hostile work environment claims brought under Title VII, § 1981, and the NYSHRL are assessed using the same standard. *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015); *Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 623 (E.D.N.Y. 2020); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013)).

We employ a totality of the circumstances approach to evaluate whether an environment is hostile and abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

"Isolated incidents of harassment ordinarily do not rise to this level," *Cruz*, 202

F.3d at 570 (citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d

Cir. 1992)), but we have recognized that "a single act can create a hostile work

environment if it in fact 'works a transformation of the plaintiff's workplace.'"

*Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Perry v. Ethan Allen,*

*Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)) (alteration adopted).

A plaintiff must show that "either a single incident was

extraordinarily severe, or that a series of incidents were 'sufficiently continuous

and concerted' to have altered the conditions of her working environment."

*Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz*, 202 F.3d at 570).

This assessment has both an objective and subjective component: "the

misconduct shown must be severe or pervasive enough to create an objectively

hostile or abusive work environment, and the victim must also subjectively

perceive that environment to be abusive." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d

379, 387 (2d Cir. 2020); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2d

Cir. 2010).

The hostility of the work environment "as a whole, not the motivation of one decisionmaker," is the central inquiry in a hostile work environment claim, and "liability is determined only by looking at all the circumstances." *Rasmy*, 952 F.3d at 389 (internal quotation marks omitted). "Evidence of a general work atmosphere . . . -- as well as evidence of specific hostility directed toward the plaintiff -- is an important factor in evaluating the claim." *Perry*, 115 F.3d at 149 (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987)). Incidents that are not facially discriminatory "may sometimes be used to establish a course of sex [and/or race]-based discrimination -- for example, where the same individual is accused of multiple acts of harassment, some overtly [discriminatory] and some not." *Alfano*, 294 F.3d at 375. Moreover, "conduct not directly targeted at or spoken to an individual but purposefully taking place in [her] presence can nevertheless transform [her] work environment into a hostile or abusive one." *Rasmy*, 852 F.3d at 389. Finally, if a plaintiff alleges harassment arising from both race and sex-based hostility, the "interplay between the two forms of harassment" is pertinent to evaluating the hostile work environment claim. *Cruz*, 202 F.3d 560, 572 (citing *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999), and *Hicks*, 833 F.2d

32

at 1416). "If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of a lack of an adverse employment decision is inappropriate." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000)).

**B.** *Application*

Because, as the district court correctly held, the continuing violations doctrine applies to Banks's hostile work environment claim, *see Banks*, 2020 WL 6827707, at *13; *Morgan*, 536 U.S. at 115, we consider incidents that occurred both prior to as well as during the limitations periods in evaluating the merits.

We conclude that there is ample evidence of racial and sexual harassment to create genuine issues of material fact as to Banks's hostile work environment claim. The district court acknowledged that Banks presented evidence of "intimidation, ridicule, and insult (both to her and to other African American or female employees)" in the form of "graffiti, silhouettes, Confederate flags displayed at the Lockport Plant, harassment, and [] comments and epithets," but the court nevertheless held that "[a] reasonable person would not

33

find the environment at General Motors's Lockport Plant was hostile or abusive to female or African American employees." *Banks*, 2020 WL 6827707, at *15-16. Banks, however, provides extensive and detailed examples of pervasive and long-term sex and race-based animosity that a reasonable jury could find created a hostile work environment. Summary judgment is inappropriate where, as here, "admissible materials in the record 'make it arguable' that the claims have merit." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Jasco Tools v. Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009)).

A jury could reasonably find that the allegedly discriminatory behavior fomented a hostile work environment for two reasons. First, the jury could find that one incident was sufficiently severe such that it altered the conditions of Banks's employment. Second, a jury could find that the discriminatory intimidation, ridicule, and insult that Banks and other Black employees experienced were pervasive inside the Lockport Plant. Either finding would be sufficient to support a hostile work environment claim. *See, e.g.*, *Howley*, 217 F.3d at 153-54; *Alfano*, 294 F.3d at 374.

34

### 1. *Severe Conduct*

We first consider the severe conduct. A single incident must be "extraordinarily severe" to support a hostile work environment claim, but it need not involve an actual or threatened physical assault. *Williams v. New York City Hous. Auth.*, 154 F. Supp. 2d 820, 823 (S.D.N.Y. 2001) (quoting *Cruz*, 202 F.3d at 570); *see also id.* (noting that the Second Circuit's choice not to "enunciate regimented standards is deliberate and is required to ensure adequate flexibility to promote Title VII's broad remedial purpose").

A reasonable jury could find that Banks's altercation with Rush in 2013 over a personnel dispute rises to this threshold of sufficient severity. When Rush confronted Banks over her decision to dismiss a contractor for failing to adhere to safety protocols -- a decision within her discretion as Safety Supervisor -- he shook a rolled-up document in her face and started yelling at her in a loud and aggressive manner. Rush could be heard yelling from 50 feet away, his behavior alarmed other colleagues, and Banks was so intimidated by his tirade and physically threatening demeanor that she eventually withdrew the dismissal order. Another plant employee, who went to Banks's office when he heard Rush yelling, was so concerned that he was prepared to physically protect

35

Banks from Rush. Gouthro, whose office was 50 feet away from the altercation, told Banks that the yelling was so loud that she thought it was a drunk employee. Banks alleges that this incident was so severe that it compelled her to take disability leave and to file her Awareline and EEOC complaints.

We have held that a tirade involving "obscene comments" delivered "at length, loudly, and in a group in which [the plaintiff] was the only female" precludes a grant of summary judgment on a hostile work environment claim. *Howley*, 217 F.3d at 154. The plaintiff in *Howley*, a female firefighter, was subjected to a "verbal assault" during a meeting by a male coworker who told her to "shut the f**k up, you f***ing whining c***t" in front of group of male firefighters, many of whom were Howley's subordinates. *Id.* at 148. In holding that this single incident could support the hostile work environment claim, we observed that the challenged conduct directly impacted the conditions of the plaintiff's employment because it "foment[ed] . . . gender-based skepticism as to the competence of a commanding officer," "diminish[ed] the respect accorded to the officer by subordinates," and "impair[ed] her ability to lead in the life-threatening circumstances often faced by firefighters." *Id.* at 154. Given the particular urgency that firefighters comply with the directives of their superiors,

36

and recognizing the potential of such a tirade to erode this authority, we vacated the grant of summary judgment because "[i]t cannot be concluded as a matter of law that no rational juror could view such a tirade as humiliating and resulting in an intolerable alteration of Howley's working conditions." *Id*.

A jury could find that the incident involving Rush was similar to the incident in *Howley* because Rush's act of public insubordination undermined Banks's responsibility to ensure compliance with the plant's safety protocols. Not only did the incident involve a perceived physical threat, but it directly challenged Banks's authority and compromised her ability to fulfill her supervisory duties. Indeed, Rush had neither been involved in supervising the contractor nor had he inspected the particular safety situation at issue. When considered in the context of the evidence of pervasive discriminatory conduct discussed below, a jury could reasonably find that Rush's reaction to Banks's discretionary decision was disproportionate and motivated by discriminatory animus. Far from constituting "a mild, isolated incident," a jury could find that the Rush incident was "'of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Whidbee*, 223 F.3d at 70 (quoting *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997)). In any

37

event, even assuming that Rush's tirade is insufficiently severe by itself, it is surely relevant to an analysis of the pervasiveness of the discriminatory conduct within the Lockport Plant.

### 2. *Pervasive Conduct*

Moving to pervasive conduct, a reasonable jury could find that the discriminatory conduct was sufficiently pervasive and widespread within the Lockport Plant to have created a hostile work environment. To be deemed pervasive, the challenged incidents "must be more than episodic; they must be sufficiently continuous and concerted." *Perry*, 115 F.3d at 149. Although the district court found that the discriminatory incidents were "isolated" and "not extremely serious either taken singly or collectively," *Banks*, 2020 WL 6827707, at *16, we conclude that a reasonable jury could find that the incidents indeed evinced a culture of hostility towards Black and female employees. Banks was the recipient of sexually demeaning language, as were her female colleagues, and worked in a setting where images of pin-up women and sexually explicit silhouettes were common. From 2006 to 2016, Banks and other Black employees saw nooses, Confederate flags, and other racially offensive material around the plant, including a Black test dummy seated on a vehicle wearing minimal and

38

tattered clothes.[11] As the district court recognized, Black colleagues were subjected to "a steady barrage of racial insult and epithet." *Id.* at *15. Specifically, several colleagues testified to being called "n****r" and "silverback" and having their work deemed "n****rized." J. App'x at 540.

A jury could reasonably find that the placement of three nooses at or near the workstations of Black employees within the Lockport Plant -- even over the course of 11 years -- was sufficiently pervasive to support a hostile work environment claim. "[T]here can be little doubt that such a symbol is significantly more egregious than the utterance of a racist joke." *Williams*, 154 F. Supp. 2d at 823. Instead, "the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence." *Id.* at 824. "Like 'a slave-masters whip,' the image of a noose is 'deeply a part of this country's collective consciousness and history, [and] any further explanation of how one could infer a racial motive appears quite unnecessary.'" *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1142 (10th Cir. 2008) (quoting *Johnson v. Potter*, 177 F. Supp. 2d 961, 965 (D. Minn. 2001)) (alterations adopted); *see also Vance v. S. Bell Tel. & Tel. Co.*, 863

---

[11]     Many of these items were "visible to anyone walking through the aisles of the plant." J. App'x at 599. The record also reflects that some of the displays were reported to management. *Id*. at 1645, 1841.

F.2d 1503, 1511 n.4 (11th Cir. 1989) ("It is hard to imagine an incident of this sort taking place in 1984. The grossness of hanging an object resembling a noose at the work station of a [B]lack female is self-evident."), *abrogated on other grounds by Harris*, 510 U.S. at 20; *Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1253 (11th Cir. 2014) (observing that the display of a noose within a workplace constitutes "a severe form of racial harassment").

A reasonable jury could find that even a single placement of this object -- imbued as it is with historical gravity as a symbol and tool of actual violence -- directly at the workstation of a Black employee could amount to severe conduct sufficient to support an inference that the workplace is hostile to Black employees. *See, e.g.*, *Williams*, 154 F. Supp. 2d at 822-26 (denying motion to dismiss because a single instance of a noose displayed in a White supervisor's office was sufficiently severe to support a hostile work environment claim); *Tademy*, 614 F.3d at 1141-42 (reversing a grant of summary judgment because a jury could find that the placement of a noose near a clock, "where it was most likely to be seen and where it could have maximum effect," could support a hostile work environment claim). Here, Black employees found nooses placed deliberately at their workstations on three separate occasions. A reasonable jury

could surely find that the discovery of multiple nooses within the Lockport Plant created a hostile work environment. *See, e.g.*, *Hollins v. Delta Airlines*, 238 F.3d 1255, 1257-58 (10th Cir. 2001) (holding that the discovery of nooses within a workplace created genuine issues of material fact that precluded summary judgment on a hostile work environment claim). Yet the district court omitted any mention of these nooses, evidence for each of which exists in the form of deposition testimony, internal investigative reports, and photographs. Given the "repugnan[ce]" of this object, *Williams*, 154 F. Supp. 2d at 824, and its direct implication of racial animus and violence, a reasonable jury could surely conclude that the discovery of multiple nooses within Banks's workplace constituted pervasive discrimination that "alter[ed] the conditions of [her] employment and create[d] an abusive working environment." *Harris*, 510 U.S. at 21.

Second, multiple circuit courts have emphasized that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n****r.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426,

41

439 (2d Cir. 1999)); *see also Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). The epithet has been "described as 'a term that sums up . . . all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in English.'" *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, *J.*, concurring)) (alterations adopted). Courts have also held that use of the word "monkey" or derivative terms is "similarly odious" and that their use within the workplace constitutes compelling evidence of a racially hostile work environment. *See Spriggs*, 242 F.3d at 185 ("To suggest that a human being's physical appearance is essentially a caricature . . . goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that a triable issue of fact existed on a hostile work environment claim where African American employees were subjected to, *inter alia*, "patently offensive remarks regarding the[ir] hair" and "conversations in which a co-worker and supervisor used the word 'n****r'").

In *Rivera*, where an African American employee alleged a hostile work environment based, in part, on a supervisor's repeated use of a racial slur,

we concluded that "whether the conduct taken together created a work environment that was sufficiently hostile to violate Title VII is a question of fact for the jury." *Rivera*, 743 F.3d at 24. The same outcome is required here. Because the record indicates that Banks and other African American employees were the target of "frequent and highly repugnant insults," we conclude that a reasonable jury could find that the use of racial epithets and other racially motivated conduct was sufficiently pervasive -- even if not independently severe -- to support a hostile work environment claim. *Spriggs*, 242 F.3d at 185.

The district court's description of the "isolated" epithets levied against Banks suggests it viewed these comments as "stray" remarks. But "the stray remarks doctrine is by no means dispositive." *Rasmy*, 952 F.3d at 389 (internal marks omitted). "While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.'" *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)); *see also Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115-16 (2d Cir.

2007) ("Where we described remarks as 'stray,' the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination . . . . We did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category.").  In assessing a hostile work environment claim, "the emphasis is on the hostility of the work environment as a whole" and a plaintiff "must show merely that discriminatory incidents were 'sufficiently continuous and concerted to have altered the conditions of the employee's working environment.'"  *Rasmy*, 952 F.3d at 389 (alteration adopted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, *J.*, concurring) (noting that stray remarks in the workplace can be probative of sexual harassment).

In addition, it is not germane that the racial epithets were directed at other employees instead of Banks.  The district court focused on the fact that other employees "endured a steady barrage of racial insult and epithet" while Banks was subject to "non-ethnic offending terms," such as being called "an idiot" at a meeting where she was not present.  *Banks*, 2020 WL 6827707, at *15.  The court noted that while other Black coworkers were called "n****r" by other White coworkers, Banks did not personally endure such epithets within the limitations

44

period.  *Id.* at *3.  Yet "[t]he mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to [her] hostile work environment claim."  *Schwapp*, 118 F.3d at 111.  "Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."  *Id*. (citing *Rodgers*, 12 F.3d at 673, 675, and *Perry*, 115 F.3d at 151).

Moreover, we have previously held that incidents involving other employees, while they "may be of limited probative value, [] cannot be ignored on summary judgment."  *Id.* at 112.  Instead, "[w]hether [the plaintiff] was aware of [the incidents] during his employment, and, more significantly, whether in light of these incidents, the incidents [the plaintiff] experienced more directly 'would reasonably be perceived, and [were] perceived, as hostile or abusive,' are factual issues" more appropriate for a trier of fact.  *Id*. (citing *Harris*, 510 U.S. at 22).  In *Perry*, we concluded that "[e]vidence of the harassment of women other than Perry, if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment."  *Perry*, 115 F.3d at 151;

45

*see also Cruz*, 202 F.3d at 570 ("[A] plaintiff who herself experiences

discriminatory harassment need not be the target of other instances of hostility in

order for those incidents to support her claim."). Despite the fact that Banks

herself was not the target of each derogatory comment, the regularity with which

such racial epithets and derogatory remarks were levied against other Black

colleagues -- one employee testified to be being called the N-word as often as

"every day" -- is relevant to her claim that a culture of racial hostility existed at

the plant. J. App'x at 544-45, 604.

### 3.    *Tangible Harm*

Finally, the district court erred in focusing on the lack of tangible

harm that Banks incurred from the discriminatory harassment. Despite evidence

of Banks's need for multiple medical leaves for stress and anxiety, her

psychological treatment, and her need for anti-anxiety medication, the district

court dismissed her claim because it found that Banks "suffered no adverse

consequences . . . save her stress claim." *Banks*, 2020 WL 6827707, at *16. The

Supreme Court made clear in *Harris*, however, that Title VII does not require

"concrete psychological harm" for a claim to be actionable, as the statute

"[c]ertainly . . . bars conduct that would seriously affect a reasonable person's

46

psychological well-being." 510 U.S. at 22. All that is required is that "the environment . . . reasonably be perceived, and is perceived, as hostile or abusive." *Id*. And "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Id.* at 23.

Moreover, "the language of Title VII is not limited to 'economic' or 'tangible' discrimination." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986); *see also Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc) ("The unadorned wording of [Title VII] admits of no distinction between 'economic' and 'non-economic' discrimination or 'tangible' and 'intangible' discrimination."). Tangible effects include detrimental impacts on an employee's job performance, discouraging employees from staying on the job, or other effects that prevent employees from advancing in their careers. *See Harris*, 510 U.S. at 22. Yet, "even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equity." *Id.*

There is ample evidence from which a reasonable jury could conclude that Banks found the environment at the Lockport Plant to be hostile and abusive. Given that Banks took multiple medical leaves, sought psychological treatment, and was prescribed anti-anxiety medication to cope with the stress and anxiety she incurred from the discriminatory harassment, it was error for the district court to minimize Banks's suffering and characterize it merely as "stress." *Banks*, 2020 WL 6827707, at *16. Instead, we conclude that a reasonable jury could find that Banks suffered concrete psychological harm or, at the very least, that she perceived her working environment to be hostile in a manner that changed her working conditions. Either finding would support a claim under Title VII. *See, e.g.*, *Rasmy*, 952 F.3d at 390 (holding that evidence that workplace harassment drove plaintiff to seek anti-anxiety medication "arguably gives rise to a strong inference that [plaintiff's] workplace conditions had been materially altered"). As for tangible effects, Banks arguably incurred such detrimental impacts because the discriminatory harassment impacted her ability to do her job, required her to take several disability leaves, and gave rise to the circumstances that led to the suspension of her disability benefits.

"[W]e have repeatedly cautioned against setting the bar too high" in establishing the standard for a hostile work environment claim. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). Drawing all inferences in Banks's favor, a reasonable jury could find that either a singular incident of severe hostility or a pervasive pattern of discriminatory conduct could support Banks's allegation that the atmosphere at the Lockport Plant was hostile to Black and female employees. *See, e.g.*, *Fitzgerald*, 251 F.3d at 360 ("If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate."). Accordingly, we conclude that the district court erred in granting summary judgment to General Motors on Banks's hostile work environment claim.[12]

---

[12] In its brief on appeal, General Motors asserts, "out of an abundance of caution," an affirmative-defense argument that it "exercised reasonable care to prevent and correct promptly any harassing behavior" and that Banks "unreasonably failed to take advantage of any preventive or corrective opportunities provide by [General Motors] or to avoid harm otherwise." Appellee's Brief at 32-34 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Ellerth*, 524 U.S. at 765). On this record, there remain issues of fact as to whether Banks adhered to General Motors's anti-harassment policy and availed herself of the appropriate internal mechanisms to report harassing behavior. *See, e.g.*, J. App'x at 1545 (directing employees to report violative conduct to their supervisor, personnel director, or equal employment opportunity or human resources representative, or to utilize an internal mechanism, such as Awareline).

## III.     The Disparate Treatment Claim

Next, we consider Banks's claim that General Motors discriminated against her on the basis of race and sex, in violation of Title VII, § 1981, and the NYSHRL.

### A.     *Applicable Law*

Section 703(a)(1) of Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In adopting this language, "Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin." *Chambers*, 35 F.4th at 882 (Walker, *J.*, concurring in part).

To prevail on a disparate treatment claim under Title VII, plaintiffs must establish that they have suffered an "adverse job action under circumstances giving rise to an inference of discrimination." *Tassy v. Buttigieg*, 51 F.4th 521, 529 (2d Cir. 2022) (citing *Feingold*, 366 F.3d at 149). Such employment actions are "'easy to identify,' generally because they involve material changes to

an employee's conditions of employment." *Id*. (citing *Morgan*, 536 U.S. at 114).

We have recognized that an "adverse employment action" is one that is "more

disruptive than a mere inconvenience or an alteration of job responsibilities."

*Terry*, 336 F.3d at 138.

The category of employment decisions that constitute adverse

actions is "broad" in scope. *Treglis v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir.

2002). Examples of adverse employment actions include "termination of

employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation." *Terry*, 336

F.3d at 138. In addition to terminations of employment and demotions, failure to

promote and internal transfers may also qualify as adverse actions. *See id*. (citing

*Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) (listing a refusal to promote

among potential adverse employment actions)); *Morris v. Lindau,* 196 F.3d 102,

113 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d

127 (2d Cir. 2012) (an internal transfer can be an adverse action if "accompanied

by a negative change in the terms and conditions of employment"). Indeed, "no

particular type of personnel action is automatically excluded from serving as the

basis of a cause of action under Title VII, as long as the plaintiff is aggrieved by the action." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (alterations adopted) (internal marks and citation omitted).

Nor is economic harm required for an employment decision to be actionable under Title VII. *See Threat v. City of Cleveland, Ohio*, 6 F.4th 672, 680 (6th Cir. 2021) (citing *Meritor Sav. Bank*, 477 U.S. at 64) ("As the words after 'compensation' suggest, Title VII indeed extends beyond 'economic' discrimination."). This is evident from a plain reading of the statute, as requiring economic harm to sustain a Title VII claim "would render meaningless many of the words in the statutory phrase 'compensation, terms, conditions, or privileges of employment.'" *Id*. For example, the statute explicitly refers to "privileges," the loss of which might not involve economic harm. 42 U.S.C. § 2000e-2(a)(1). Accordingly, we have held that certain employment decisions are actionable even though they did not result in a decrease in salary. *See, e.g.*, *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (a lateral transfer was an adverse employment action even if the employee's salary did not decrease because the transfer involved diminished prestige, fewer advancement opportunities, and a change in responsibilities).

A plaintiff may prove discrimination either by direct evidence of intent to discriminate or "indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87; *see also Tolbert v. Smith*, 790 F.3d 427, 436-37 (2d Cir. 2015). To prove discrimination indirectly, a plaintiff can meet the requirements of the *McDonnell Douglas* burden shifting framework or "by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Id*. (internal marks and citation omitted).

Under the *McDonnell Douglas* framework, a plaintiff must first make out a *prima facie* showing of discrimination by showing that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The Supreme Court has made clear that a plaintiff's burden of "establishing a prima face case . . . is not onerous." *Burdine*, 450 U.S. at 253. "In fact, the plaintiff's burden of establishing a *prima facie* case has been frequently described as 'minimal.'" *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc) (quoting *St. Mary's*

*Honor Cntr. v. Hicks*, 509 U.S. 502, 506 (1993), *abrogated on other grounds by Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)).

Once a *prima facie* case has been shown, "a presumption arises that

more likely than not the adverse conduct was based on the consideration of

impermissible factors." *Vega*, 801 F.3d at 82-83 (citing *Burdine,* 450 U.S. at 253-54).

The burden then shifts to the employer to "articulate some legitimate,

nondiscriminatory reason" for the adverse employment action. *McDonnell*

*Douglas*, 411 U.S. at 802. If the employer articulates such a reason, the burden

shifts back to the plaintiff to show that the employer's "stated reason for [the

adverse employment action] was in fact pretext" for discrimination. *United States*

*v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011); *see also Graham v. Long Island R.R.*, 230

F.3d 34, 38 (2d Cir. 2000).

B.   *Application*

The district court granted summary judgment to General Motors

because it concluded that Banks failed to establish a *prima facie* case of

discrimination.[13] Specifically, the district court held that Banks's demotion was

---

[13]    The district court found that Banks satisfied the first two requirements of a *prima facie* case of discrimination because Banks, a Black female, is a member of two protected classes and General Motors did not contest that she was qualified for her job. *See Banks*, 2020 WL 6827707, at *14.

54

not an adverse employment action because she had not suffered a "change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Banks*, 2020 WL 6827707, at *14 (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). The district court also found that although Banks's delayed return to work "might be an adverse action," it ultimately could not support the discrimination claim because she had failed to allege an inference of discrimination. *Id*.

We conclude that the district court erred because a reasonable jury could find that General Motors's decisions to delay Banks's return to work and to reassign her upon her return are adverse actions that give rise to an inference of discrimination. We address each action in turn.

### 1.  *The Delayed Return to Work*

We begin with Banks's delayed return to work. Although the district court observed that the delay "might be an adverse action," it concluded that it was not because Banks failed to "allege[] that Dr. Jones' refusal to clear her was due to her gender or race" and she "had not claimed that [General Motors] induced Dr. Jones to delay his authorization." *Banks*, 2020 WL 6827707, at *14. The district court concluded that Banks's delayed return to work failed to

55

support her claim because she "did not establish an inference of discrimination." *Id.*

As an initial matter, Banks did allege that General Motors's actions -- including its decision to delay her return -- constituted unlawful discrimination on the basis of race and sex. *See* Complaint at 22, 27, *Banks v. General Motors, LLC*, 2020 WL 6827707 (W.D.N.Y. 2014) (No. 14-cv-970) (Dkt. 1). Moreover, Banks presented evidence from which a reasonable jury could infer discriminatory intent in the delay of her return to work, including Dr. Jones's remark that Banks's upbringing was the cause of her "breakdown," his implication of stereotypes about Black women by commenting that Banks lacked "conflict resolution skills," and General Motors's deviation from company policy in requiring Banks to obtain additional psychiatric clearance before allowing her to return. J. App'x at 503.

"[A] plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing . . . biased comments by a decisionmaker." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) (citing *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (internal quotation marks omitted)). Banks filed her various complaints to report incidents of race and sex

discrimination, particularly the incident involving Rush. A reasonable jury could find that, by implying that Banks lacked the skills to handle or resolve the situations about which she complained, Dr. Jones was suggesting that Banks's reactions to the discriminatory incidents -- rather than the incidents themselves -- were the main problem. Indeed, a reasonable jury would not need to strain to find that Dr. Jones's remarks implied that Banks's reactions to the discriminatory harassment were disproportionate or irrational, implicating the racial stereotype of the "angry Black woman." *See, e.g.*, *Curry v. Devereux Found.*, 541 F. Supp. 3d 555, 557 (E.D. Pa. 2021) (observing that "the destructive power of this particular label is significant, in part due to the degree in which it can inhibit Black women from asserting their rights"); *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 413 (4th Cir. 2022) (Motz, *J.*, concurring) ("[W]hen an African American woman asserts herself, she is often tagged by her supervisors and coworkers as an 'angry Black woman,' a harmful and well-rooted racial stereotype."). Such comments that indicate racial or sexual stereotyping "can create an inference of discriminatory motive." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997); *see also Lindahl v. Air France,* 930 F.2d 1434, 1439 (9th Cir. 1991)

57

(supervisor's remarks indicating sexual stereotyping created inference of discriminatory motive).

Similarly, Dr. Jones's comment insinuating that Banks's mental and emotional hardships were attributable to her family background could also lead to an inference of discrimination. After Dr. Jones's initial query as to whether Banks had been raped or otherwise experienced childhood traumas, she responded that she had had a happy childhood, her parents had been married for 50 years, and she maintained close relationships with her five siblings. Despite her attestation that she grew up in an emotionally stable environment -- a response that addressed Dr. Jones's purported concern that her childhood was the root cause of her mental and emotional issues -- Dr. Jones still asserted that Banks's complaints about discriminatory harassment were insufficient to cause her depression and anxiety and that something in her background was to blame. Implicit in this response is a negative assumption about Banks's family which -- considering that Dr. Jones had only just met Banks, and in light of her description of her happy and tight-knit family -- arguably could only have reflected racial animus.

Finally, a reasonable jury could also infer discriminatory intent in General Motors's decision to require that Banks obtain psychiatric approval from Dr. Jones, in contravention of company policy and contrary to the approval process Banks had undergone for her prior disability leaves. The district court erred in determining that Banks "did not establish an inference of discrimination," *Banks*, 2020 WL 6827707, at *14, when the proper inquiry was, instead, whether there was sufficient evidence for a reasonable jury to infer a discriminatory motive. *See, e.g., Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995) ("[T]he function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)). Multiple General Motors employees -- including the plant physician, Dr. Ulatowski, who had approved Banks's return to work -- indicated that obtaining approval from Dr. Jones was unusual and deviated from regular practice. Construing the facts in the light most favorable to Banks, a

59

reasonable jury could infer that Banks's delayed return to work was driven by discriminatory intent. *See Feingold*, 366 F.3d at 153.

**2.** *The Reassignment*

Next, we turn to Banks's reassignment from the position of Safety Supervisor to Safety Representative upon her return to work. Banks's reassignment consisted of two discrete actions: her replacement by a White man while on medical leave, contrary to company policy, and her reassignment to a position with fewer responsibilities and a less desirable shift. To assess whether Banks's reassignment constitutes an adverse action, we ask whether it impacted the "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). We conclude that a reasonable jury could find that it did.

When a plaintiff alleges that a job transfer constitutes an adverse employment action, she must only show that the new work assignment was "materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). "The transfer of an employee from an 'elite' position to one that is 'less prestigious . . . with little opportunity for professional growth' is sufficient to permit a jury to infer that the transfer was a materially

60

adverse employment action."  *Lore*, 670 F.3d at 170 (citation omitted); *see also*

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (holding

that a jury could find a reassignment from a position with "an indication of

prestige" to one involving less desirable responsibilities "would have been

materially adverse to a reasonable employee"); *de la Cruz*, 82 F.3d at 21 (transfer

to a "less prestigious" department with fewer opportunities for advancement was

an adverse employment action).  Other circuits agree.  *See, e.g.*, *Wallace v.*

*Performance Contractors, Inc.*, 57 F.4th 209, 218 (5th Cir. 2023) (quoting *Alvarado v.*

*Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007)) (an employment action is

"equivalent to a demotion" even if it does not "result in a decrease in pay, title, or

grade; it can be a demotion if the new position proves objectively worse -- such

as being less prestigious or less interesting or providing less room for

advancement").

The record is replete with evidence from which a reasonable jury

could find that General Motors's decision to reassign Banks while she was out on

disability leave was an adverse action.  When she was reassigned from Safety

Supervisor to Safety Representative, as Banks testified, she was stripped of her

supervisory responsibilities and moved to a less desirable shift.  She was no

longer included in supervisory meetings, and her new shift -- from 3:00pm to 12:00am -- negatively impacted her advancement goals because it reduced her interactions with management.  A reasonable jury could find that Banks's transfer to a non-supervisory role upon returning from disability leave constituted a demotion because it curtailed her responsibilities, reduced her chances for promotion, reduced her rank within the safety department, and put her in a less desirable shift.  *See Patrolmen's Benevolent Ass'n v. City of New York,* 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion." (internal quotation marks omitted)); *Threat*, 6 F.4th at 677 ("[I]t is straightforward to say that a shift schedule . . . counts as a term of employment.").

Moreover, the district court erred in holding that Banks's reassignment was not adverse as a matter of law because she "did not claim a loss of salary or benefits after returning from her medical leave." *Banks*, 2020 WL 6827707, at *14.  The fact that Banks did not undergo a salary cut does not preclude the possibility that a reasonable jury could find that the reassignment -- considering its impact on Banks's work hours, title, responsibilities, and

62

opportunities to interact with management -- was adverse. *See, e.g., Patrolmen's Benevolent Ass'n v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002); *Rodriguez v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 365-66 (2d Cir. 1980); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (evidence that a transfer that did not affect employee's salary or benefits but resulted in a "less distinguished title" and "significantly diminished material responsibilities" is sufficient for a jury to conclude that the transfer was adverse). Although a reassignment that results in a decrease in salary can clearly constitute an adverse employment action, we have consistently held that the absence of a salary decrease is not dispositive. *See, e.g., Patrolmen's Benevolent Ass'n*, 310 F.3d at 51 ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way."); *Rodriguez*, 620 F.2d at 365-66 (holding that transfer of a middle school art teacher to an elementary school, despite no change in salary, was an adverse action).

Furthermore, a reasonable jury could find that General Motors's decision to replace Banks while she was on leave, without approval from human resources and in contravention of company policy, gives rise to an inference of

63

discrimination.  Though a deviation from policy, standing alone, may not be

sufficient to demonstrate discriminatory animus, *see Mitchell v. USBI Co.*, 186 F.3d

1352, 1355-56 (11th Cir. 1999), "[s]ignificant, unexplained or systematic deviations

from established policies or practices can no doubt be relative and probative

circumstantial evidence of discriminatory intent," *Hanners v. Trent*, 674 F.3d 683,

694 (7th Cir. 2012).  Indeed, Gouthro's actions in posting Banks's position without

appropriate approval clearly "surprised" Horton, the corporate human resources

manager, who indicated that General Motors could be facing a "situation"

because of Gouthro's decision to replace Banks.  J. App'x at 1600-01.  Together

with the other circumstantial evidence of racial discrimination, we conclude that

there is sufficient evidence from which a reasonable jury could conclude that

Banks's reassignment was motivated by discriminatory animus.[14]  The district

---

[14]    The district court, in concluding that Banks failed to allege a *prima face* case of discrimination, did not reach the second and third prongs of the *McDonnell-Douglas* burden shifting framework.  *See Banks*, 2020 WL 6827707, at *14.  On appeal, General Motors contends that the "need for safety support on the second shift as well as Banks'[s] stated interest in serving in a Labor Relations role" constitute legitimate, non-discriminatory reasons for Banks's reassignment.  Appellee's Brief at 44.  On this record, there remain issues of fact as to whether General Motors's reasons are pretextual and discrimination was the real reason for the reassignment.  *See, e.g.*, *Reeves*, 530 U.S. at 143 ("[T]he trier of fact may [] consider the evidence establishing the plaintiff's prima face case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" (quoting *Burdine*, 450 U.S. at 255 n.10)).

court erred in granting summary judgment to General Motors on the discrimination claim.

**IV.     The Retaliation Claim**

Finally, we consider Banks's claim that General Motors engaged in unlawful retaliation against her, in violation of Title VII, § 1981, and the NYSHRL.

**A.     *Applicable Law***

Title VII prohibits an employer from discriminating against an employee because the employee has engaged in protected activity. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). Protected activity includes opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating "in any manner in an investigation, proceeding, or hearing." *Burlington Northern*, 548 U.S. at 62; *see also* 42 U.S.C. § 2000e-3(a). Retaliation claims brought under the NYSHRL and § 1981 are subject to the same standards as federal claims under Title VII. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Littlejohn*, 795 F.3d at 315. A plaintiff must show a connection between the protected activity and the adverse action, that is, that "the retaliation was a 'but-for' cause of the employer's

65

adverse action."  *Vega*, 801 F.3d at 90.  As the Supreme Court recently made clear

in *Bostock v. Clayton County, Georgia*, in addressing a discrimination claim,

however, there can be more than one "but-for" cause of an adverse employment

action.  140 S. Ct. 1731, 1739 (2020) (observing that the but-for test is a "sweeping

standard" and that "[o]ften, events have multiple but-for causes").

The antiretaliation provision of Title VII, unlike the

antidiscrimination provision, is "not limited to discriminatory actions that affect

the terms and conditions of employment."  *Vega*, 801 F.3d at 90 (quoting

*Burlington Northern*, 548 U.S. at 64).  Rather, "[a] plaintiff must show that a

reasonable employee would have found the challenged action materially

adverse, which in this context means it well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination."  *Burlington*

*Northern*, 548 U.S. at 68 (internal quotation marks omitted).  "The plaintiff's

burden in this regard is 'de minimis' and 'the court's role in evaluating a

summary judgment request is to determine only whether proffered admissible

evidence would be sufficient to permit a rational finder of fact to infer a

retaliatory motive.'"  *Hicks*, 593 F.3d at 164 (quoting *Jute v. Hamilton Sundstrand*

*Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

66

**B.** *Application*

Banks participated in protected activities when she filed the Awareline Complaint on September 16, 2013, and her EEOC charge on October 24, 2013. Banks contends that General Motors retaliated against her by terminating her medical benefits while she was on disability leave, delaying her return to work, and replacing her while she was on leave and reassigning her to an undesirable position and shift upon her return. She argues that the district court erred in concluding that none of these actions supported a *prima facie* case of retaliation. We agree.

**1.** *The Suspension of Benefits*

We first address the suspension of Banks's benefits. The district court initially held that Banks had alleged a *prima facie* case of retaliation arising from this incident and presented evidence to show that General Motors's non-retaliatory reasons were pretextual. *Banks*, 2020 WL 6827707, at *16. The district court observed that "[c]utting off full or partial salary while an employee is on leave would be an adverse employment decision" and noted that "[a]nimus can be inferred from the comment Plaintiff received a month after losing those benefits that it must have been tough to go without." *Id.* at *17. On

reconsideration, however, the district court found that because Banks was eventually repaid the amount of the suspended benefits, her alleged suffering amounted to a "trivial harm" insufficient to support a *prima facie* case of retaliation. *Banks*, 2021 WL 4323909, at *10.

The district court's conclusion on reconsideration is contrary to established precedent. The Supreme Court in *Burlington Northern* made clear that the provision of backpay does not preclude a finding that the initial suspension of income was materially adverse. 548 U.S. at 72. In that case, the plaintiff alleged that she was suspended for 37 days without pay in retaliation for filing a complaint with the EEOC. *Id.* at 58. As a consequence, she and her family suffered from the loss of income and she sought medical treatment for her ensuing depression. *Id.* at 72-73. The Court held that an employer could not "avoid liability" by providing backpay because such a payment would not erase the serious "physical and emotional hardship" that the plaintiff endured when she was without income. *Id.* at 72. It observed that "an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay," because a "reasonable employee facing the choice

68

between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former." *Id.* at 73.

Like the plaintiff in *Burlington Northern*, Banks alleges that the termination of her benefits was an adverse employment action, even though they were eventually reinstated retroactively. Though General Motors's short-term disability policy provides that employees will receive 100% of their salary for the first 13 weeks of leave, Banks's benefits were terminated on or around November 22, 2013, only one month after she filed her EEOC charge and approximately 10 weeks into her disability leave. Banks's disability payments were terminated for a total of 84 days and were not reinstated until February 15, 2014. During that period of approximately three months, Banks testified that she was unable to pay her bills or support members of her family and that her medical condition worsened. As she had no indication that General Motors would reinstate her benefits, she "struggled daily with severe anxiety, regular panic attacks, headaches, insomnia, and digestive issues." J. App'x at 1957-58. Viewing these facts in a light most favorable to Banks, we conclude that a jury could find that the suspension of Banks's benefits amounted to much more than -- in the district court's words -- a "petty slight." *Banks*, 2021 WL 4323909, at *10.

69

## 2. *The Delayed Return to Work*

Next, we address Banks's retaliation claim relating to her return to work. Banks contends that General Motors retaliated against her by requiring her to undergo an additional psychiatric evaluation that delayed her return to work, which deviated from General Motors's usual practice for employees returning from leave. Moreover, she contends that the reason the psychiatrist gave for his initial refusal to approve her return explicitly reflected retaliatory animus.

The district court acknowledged that Dr. Jones's involvement was "suspect" and that "[s]ubstantively there is an apparent causal connection between Plaintiff seeking reinstatement and the delay due to Dr. Jones's refusal." *Banks*, 2020 WL 6827707, at *17. The district court noted that "[t]he psychiatric relevance of her EEOC proceeding is questionable" and that a jury could infer retaliatory intent in delaying Banks's return. *Id.* Yet the district court then dismissed Banks's claim because it concluded that the four months that elapsed between Banks's Amended EEOC charge (December 2013) and Dr. Jones's refusal to approve Banks's return to work (April 2014) exceeded the "outer limit of what

would be deemed a reasonable causal connection between these two events." *Id.* at *18.

As the district court concluded, the jury could find retaliatory intent in Dr. Jones's refusal to approve Banks's return to work. Indeed, the record includes both direct and indirect evidence to support this finding. The district court's conclusion, however, that that four-month gap was too extended is flawed.

There is strong direct evidence from which a reasonable jury could conclude that General Motors's refusal to approve Banks's return to work was driven by retaliatory intent. Direct evidence is that which "demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019) (citation omitted). "[W]hether evidence is direct depends on its causal strength." *Id.*; *see also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (evidence that employer "expressly penalize[d]" the plaintiff for his excessive

71

absences, including those protected by statute, was direct evidence of retaliation).

Here, Dr. Jones specifically referred to Banks's Awareline and EEOC complaints during each call he had with Banks. During their first call, Dr. Jones referenced her EEOC and Awareline claims as a reason for delaying Banks's return to work, saying that the claims indicated that she needed to work "on her conflict resolution skills." In September 2014, during another conference call, Dr. Jones observed that the EEOC and Awareline investigations were complete and stated: "We didn't find anything so that's over, so are you ready to come back to work[?]" J. App'x at 343. Dr. Jones's explicit reference to the status of Banks's complaints and their correlation to his approval decisions is direct evidence sufficient to support a finding of retaliatory intent.

The record also includes indirect evidence of retaliation in the form of the close temporal relationship between Banks's filing of her EEOC charge and the denial of her return to work. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (quoting *Gorman-Bakos v. Cornell Coop.*

72

*Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). While this Court

has "not drawn a bright line defining . . . the outer limits beyond which a

temporal relationship is too attenuated to establish causation," *id.*, we have

previously held that a period of several months can demonstrate a causal

connection between the protected activity and the alleged adverse action. *See,*

*e.g.*, *Gorman-Bakos*, 252 F.3d at 555 (four months between employment action and

protected activity was sufficient to support an inference of a causal connection);

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight months

between EEOC complaint and retaliatory action suggested a causal relationship).

Where temporal proximity is not the only evidence that bears on a

causal connection, we have recognized that the lapse in time between the

protected activity and adverse action can be longer. *See, e.g.*, *Patane v. Clark*, 508

F.3d 106, 116 (2d Cir. 2007) (per curiam) (plaintiff sufficiently alleged causation,

despite alleged one-year delay between protected activity and retaliatory action,

because the causation was not solely alleged based on temporal proximity);

*Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) (allowing a retaliation

claim to proceed despite a three-year delay between plaintiff's first EEOC charge

and the adverse employment action).

73

Even if we use the date of Banks's initial EEOC complaint on October 24, 2013 -- the district court calculated the elapsed time using Banks's amended EEOC complaint filed on December 9, 2013 -- the approximately six months that elapsed between her filing her complaint and Dr. Jones's refusal to approve her return fits within the range of time that we have held can support a reasonable inference of causation. *See, e.g.*, *Patane*, 508 F.3d at 116; *Duplan,* 888 F.3d at 626. This is particularly true given the direct evidence of a causal relationship between Banks's protected activity and her delayed return to work. On this record, a reasonable jury could surely find that but for Banks's filing of her discrimination complaints, General Motors would not have delayed her return to work.

### 3. *The Reassignment*

Finally, the district court dismissed Banks's retaliation claim relating to her reassignment. It found that because her "reassignment was temporary, for a few weeks," and she was eventually reassigned back to the first shift, the reassignment was not an adverse action. The court concluded that it was "not credible that [General Motors] would retaliate against [Banks] by reassigning her

74

to a less desired shift only to reassign her back upon her request." *Banks*, 2020 WL 6827707, at *19.

As discussed above, there is sufficient evidence for a reasonable jury to find that Banks's reassignment was an adverse employment action. A transfer that does not involve financial repercussions but instead involves a decrease in material responsibilities can still constitute an adverse action. *See Brady*, 531 F.3d at 134 ("Although this transfer did not affect [plaintiff's] wages or benefits, it resulted in a less distinguished title and significantly diminished material responsibilities, and therefore constituted an adverse employment action." (internal quotation marks omitted)). The district court's finding that Banks's demotion was a weeks-long change was also factually incorrect. Instead, Banks's reassignment to the second shift stretched on for four and a half months, and she was not reinstated to the first shift until six months after her return to the plant, and after she had repeatedly requested to be reassigned. Moreover, that General Motors reversed course and reinstated Banks to the first shift could also be reasonably viewed as evidence that it realized it had engaged initially in inappropriate conduct. In any event, the "short duration" of an involuntary transfer is not "a proper basis for finding, as a matter of law, that . . . no adverse

employment action occurred." *Id.* We therefore cannot say that a reasonable jury could not find that Banks's transfer and shift reassignment did not constitute retaliation.

We conclude that Banks presented sufficient direct and indirect evidence to support a claim of retaliation relating to the termination of her benefits, her delayed return to work, and her reassignment. Specifically, we hold that the suspension of Banks's disability benefits for almost three months and her reassignment could constitute adverse employment actions, and that a jury could find that there was a causal connection between her EEOC claim and her delayed return to work. Therefore, the district court erred in granting summary judgment to General Motors on Banks's retaliation claims.

## *CONCLUSION*

We conclude that summary judgment was improperly granted because there remain genuine issues of fact regarding Banks's hostile work environment, disparate treatment, and retaliation claims. Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.