*King v. Aramark Services Inc.*

In the

# United States Court of Appeals

## For the Second Circuit

August Term, 2023

(Argued: September 20, 2023   Decided: March 20, 2024)

Docket No. 22-1237

KRISTEN KING,

*Plaintiff-Appellant,*

−v.−

ARAMARK SERVICES INC.,

*Defendant-Appellee.*

Before:      WALKER, CHIN, and ROBINSON, *Circuit Judges.*

Plaintiff-Appellant Kristen King appeals from a judgment of the United States District Court for the Western District of New York (Crawford, *J.*) dismissing her claims against Defendant-Appellee Aramark Services Inc. ("Aramark").  King alleged Aramark subjected to her to a sex-based hostile work environment, sex-based discrimination, and retaliation, all in violation of the New York State Human Rights Law ("NYSHRL") and Title VII of the Civil Rights Act of 1964.  The district court dismissed King's NYSHRL claims under Federal Rule of Civil Procedure 12(b)(6) and entered summary judgment for Aramark on King's Title VII claims.

The most challenging questions we must answer on appeal are (1) whether King plausibly alleged a § 296(1)(a) violation under the NYSHRL when her complaint reflected she primarily worked in Virginia and West Virginia, but, with Aramark's permission, she worked remotely from her home in New York for a significant period of time; and (2) whether King's Title VII hostile work environment claim is timely under the continuing violation doctrine where King's firing occurred within the limitations period and was part of the course of conduct that comprised the hostile work environment.

We answer the first question in the negative because we conclude that under New York law, the impact of Aramark's alleged discriminatory acts was only incidentally felt in New York. As for King's hostile work environment claim under Title VII, King's alleged discriminatory termination was not only a discrete act supporting a distinct claim for damages; it was part of the pattern of discriminatory conduct that comprises her hostile environment claim. Accordingly, because King's termination occurred within the limitations period, the continuing violation doctrine renders King's hostile work environment claim timely.

For these reasons and others, we **AFFIRM** the district court's dismissal of King's NYSHRL claims and **VACATE** the district court's entry of summary judgment on King's Title VII claims.

————————

JOSEPHINE ANN GRECO, Greco Trapp, PLLC, Buffalo, NY, *for Plaintiff-Appellant*.

STEPHANIE SCHUSTER, Morgan, Lewis & Bockius LLP, Washington, D.C. (Anne Martinez, Morgan, Lewis & Bockius LLP, Philadelphia, PA; Jade Yee, Morgan, Lewis & Bockius LLP, Chicago, IL, *on the brief*), *for Defendant-Appellee.*

————————

2

ROBINSON, *Circuit Judge*:

In this case, Plaintiff-Appellant Kristen King claims that her employer, Defendant-Appellee Aramark Services Inc. ("Aramark"), subjected her to a sex-based hostile work environment, sex-based discrimination, and retaliation, all in violation of the New York State Human Rights Law ("NYSHRL") and Title VII of the Civil Rights Act of 1964. *See* N.Y. Exec. Law § 290 *et seq.*; 42 U.S.C. § 2000e *et seq.* We are called upon to review the district court's dismissal of her NYSHRL claim and its award of summary judgment to Aramark on her Title VII claims.

At the motion to dismiss stage, the district court concluded that King had not plausibly alleged any NYSHRL violation, so it dismissed her state law claims. *See King v. Aramark Servs., Inc.*, No. 1:19-cv-77, 2019 WL 3428833, at *14–17 (W.D.N.Y. July 30, 2019) ("*King I*"). Its dismissal encompassed two rulings. First, the district court ruled that Aramark could not incur liability under § 296(1)(a) because King was not hired as a New York-based employee. *Id.* at *15. Second, the court concluded that § 298-a, the NYSHRL provision governing extraterritorial liability, did not authorize a cause of action where an out-of-state employer committed discriminatory acts originating outside of New York. *Id.* at *15–16.

We agree with the district court's state law rulings, though we affirm its dismissal of King's § 296(1)(a) claim on slightly different grounds. Rather than

3

focus on whether Aramark hired King as a New York-*based* employee, we conclude that under the New York Court of Appeals' "impact" test, any impact felt by New York was tangential and cannot give rise to § 296(1)(a) liability.

At the summary judgment stage, the district court entered summary judgment for Aramark on all three of King's Title VII claims. *See King v. Aramark Services, Inc.*, No. 1:19-cv-77, 2022 WL 1460238 (W.D.N.Y. May 9, 2022) ("*King II*"). It concluded that King's hostile environment claim under Title VII was time-barred and that no reasonable jury could render a verdict for King on her sex-based discrimination and retaliation claims.

These rulings were erroneous. Under the continuing violation doctrine, King's hostile work environment claim was timely. A jury could reasonably conclude, based on the evidence in the record, that King's termination, which occurred within the limitations period, was part of the pattern of conduct comprising the hostile work environment in which King suffered sex-based animus. Her claim for a sex based hostile work environment was accordingly timely.

As for King's sex-based discrimination and retaliation claims, the district court impermissibly discredited evidence that King's supervisor subjected her to an unrelenting course of mistreatment that he did not impose on her male

4

colleagues with similar job titles and responsibilities. The district court also improperly discredited evidence that suggested King's supervisor interfered with an HR investigation to machinate her termination, as well as evidence that could support a finding that Aramark retaliated against King.

In sum, for the reasons set forth more fully below, we **AFFIRM** the district court's dismissal of King's state law claims, and we **VACATE** and **REMAND** with respect to her Title VII claims.

## BACKGROUND

### I. The Facts

Below, we present the facts in the light most favorable to King and draw all reasonable inferences in her favor. *See Banks v. General Motors, LLC*, 81 F.4th 242, 251–52 (2d Cir. 2023).[1]

---

[1] In Sections I.A and I.C of our factual recitation, we draw from the summary judgment record, as these facts bear on the district court's judgment for defendants under Federal Rule of Civil Procedure 56. In Section I.B, which outlines King's work arrangement and accommodations, we draw from the allegations in King complaint, as these facts bear on the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6).

*A. King's Mistreatment*

Aramark is a corporation whose business includes providing food and other services to hospitals.

From 2005 to 2010, King worked for an Aramark entity before beginning a program to receive a master's degree. In 2012, after completing her degree program, King worked for Aramark in various leadership positions servicing Aramark's contract with Valley Health System ("VHS"), pursuant to which Aramark provided food and facility services to seven healthcare facilities in Virginia and West Virginia. She first served as the General Manager of Food and Nutritional Services. About three years later, Aramark promoted King to serve as General Manager of Food and Environmental Services, a "dual manager" role that entailed supervising two business units. In 2016, after a purported corporate restructuring that eliminated dual manager positions (more on this later), King returned to her previous title as the General Manager of Food. King's job required her to manage as much as $23 million in "total managed volume," and her team transacted approximately $10 million in business annually. Jt. App'x 1116. [2]

---

[2] When quoting the summary judgment evidence, the parties' briefs, and case law, we omit all internal quotation marks, alterations, footnotes, ellipses, and citations, unless otherwise noted.

6

In February 2015, King and several male employees began reporting directly to Griffith Thomas, a district manager. From that point on, King suffered a steady course of mistreatment from Thomas, culminating in her termination in 2017.

For example, during district-wide conference calls, Thomas would single out King in front of other Aramark employees and cite her performance with VHS as a negative example of what not to do. Viewed in the light most favorable to King, Thomas's disparagement was unwarranted. King points to several examples of her satisfactory performance: On several occasions, VHS executives indicated that they were pleased with King's work; her performance metrics for client loyalty, frequency of injury, and inventory management exceeded that of some of Thomas's male direct reports; and, at Thomas's behest, King helped her male peers address their weaknesses.

Further, during King's performance review for the 2016 fiscal year, Thomas rated her as inconsistently meeting expectations and denied her a merit-based salary increase. But when Aramark looked at various objective performance metrics untethered to Thomas's personal input, it found that King met 93.9% of her corporate financial goals and 100% of her individual objectives, meriting an annual bonus equal to 94.5% of her total possible payout, or $15,300. Notably, for the three years before Thomas became King's supervisor, King received a salary

7

increase every year. This and other evidence suggest that, contrary to Thomas's criticisms, King's work on the VHS contract was at least satisfactory.

Nevertheless, Thomas often took steps to undermine her performance. He excluded King from important financial meetings and interfered with her management by meeting with her directors, clients, and subordinates without notifying her. He also gave King unrealistic deadlines and expectations, denied her appropriate office space, and spoke to her in a rude, condescending, dismissive, and hostile manner—often in front of other colleagues and superiors. King never saw Thomas treat other male workers, including his direct reports, in any of these ways.

King also maintains that Thomas fabricated performance-related complaints to try to get her fired. For instance, in a document, Thomas said King's patient satisfaction scores were below her target level. But the evidence suggests this wasn't true. At one VHS facility, King received a patient satisfaction score of 100%. Additionally, in 2017, Thomas required King to get his advance approval for any financial decision exceeding $1,000. Because King oversaw millions of dollars in business, it was infeasible to get Thomas's approval for every invoice over $1,000. By imposing this impracticable protocol, Thomas set King up to fail, which, in turn, could supply him with ammunition to critique her performance.

Thomas did not require his other male direct reports to jump through a similar $1,000 approval hoop. Moreover, when Thomas initiated disciplinary action based on King's alleged performance deficiencies, he and Aramark's Human Resources department (HR) did not substantiate their claims with supporting documentation or follow Aramark's performance management policy for handling such matters.

Significantly, during a 2016 meeting about the VHS facilities, King saw a file on Thomas's laptop named "Kristen King legal file." Jt. App'x 1171. When King asked what she did to justify the creation of the "legal file," Thomas did not answer and instead redirected the conversation. Discovery later revealed that Thomas had prepared a termination letter in July 2017—roughly two months before King was fired—under circumstances suggesting he had planned to orchestrate King's firing well before the events for which she was purportedly fired even occurred. The letter listed various reasons "to back up termination," including unsatisfactory hourly turnover rates, a statistic for which King stated she could not have been responsible and should have been attributed to an Aramark district manager. Jt. App'x 1723.

As for King's dual manager position, she reported that when Thomas told King that she would revert to her prior position, he said her demotion resulted

9

from a "corporate-wide decision" to "abolish[] the dual manager" role. Jt. App'x 1099. But King later learned a male counterpart got to keep his dual manager status. She stated that when a VHS executive found out about King's demotion, he asked, "If [the male colleague] is a dual GM, why is Kristen King not and why did you pull her from [the dual manager role?]" *Id.*

Thomas also body shamed King—that is, he implicitly disparaged her figure. In the two years in which King reported to Thomas, he would "stare" at King's midsection, where she is heavier, with "disgust." This happened two to three times per week. Jt. App'x 1097. King recalled that in 2015, when Thomas had lunch with King and her direct reports, he commented on the contents of her lunch tray, saying, "Wow, you must be hungry," implying King was overeating. *Id.* In a similar 2016 incident, Thomas said, "Wow, look at that tray," in front of one of King's male colleagues. *Id.* And, on several occasions, Thomas told King that she should go to the gym at 5:30 in the morning, as the CEO of VHS would be there, and the CEO would like to see King "actively working out at the gym." *Id.* Over the course of King's personal observations of Thomas's interactions with other male colleagues who shared similar job titles and responsibilities as her, she never saw Thomas stare at the midsections of male colleagues whose bodies were

10

comparable in size or larger than King's. Nor did she witness Thomas make weight-related comments to male colleagues.

When King complained about Thomas's behavior to HR and other high-level employees at Aramark, she received dismissive responses. For instance, after King spoke with a regional vice president about her treatment, he laughed. When she told a district manager that she "truly needed help" with Thomas's behavior, the district manager told her to "stay[] in [her] lane" or quit. Jt. App'x 1100. And, when King first called Aramark's employee hotline, the employee relations specialist did not contact any witness that King named. After completing a less-than-thorough investigation, the employee relations specialist concluded that King's claims were unfounded.

### B. King's Work-From-Home Accommodations

King's employment arrangement, and in particular her practice of working remotely from New York on numerous occasions, bear heavily on her NYSHRL claims. Upon hiring King, Aramark assigned her an office in Winchester, Virginia, at VHS's largest facility. In addition, King maintained home offices at her house in Hamburg, New York where she, her fiancé, and teenage son lived, and at her rented house in Stanley, Virginia, nearer to the VHS facilities in Virginia and West Virginia. Aramark authorized King to work from a home office on days that she

11

didn't have to be at a specific VHS facility, and she regularly did so—both from her New York and Virginia homes. When King first began working on the VHS account, her Aramark district managers approved mileage reimbursement from her Stanley, Virginia residence to the various VHS locations. (Thomas would later discontinue this reimbursement practice.) Because of King's high-level position, she had to be available 24 hours a day, 7 days a week, to address any issues that arose at the VHS facilities.

From March 2015 through November 2015, King received intermittent leave under the Family Medical Leave Act to care for her ill son. In December 2015, she went on Aramark's short term disability status in connection with a surgery. Her son passed away on December 28, 2015. During these leave periods, Aramark approved King's working from her New York home office.

While she was away, Thomas complained about King's absence and questioned the severity of her son's illness. Thomas did not make similar complaints about a male colleague who also worked remotely to help his wife suffering from a condition similar to King's son.

King returned to work from her disability leave on March 1, 2016, at which point Thomas required her to travel over 600 miles in three days to visit all of her VHS facilities with no opportunity to reacclimate back to work. Thomas did not

require a male direct report to do similar work upon his return from a medical leave.

*C. King's Termination*

After King endured two years of Thomas's mistreatment, he fired her over an alleged reimbursement violation concerning $56.68.

In April 2017, Thomas and an HR representative told King that she would no longer receive mileage reimbursement for commuting to work from her Virginia home, and she could no longer work from her home office, even though previous district managers had granted her these accommodations. On August 29, 2017, King asked Thomas to authorize reimbursement for a rental car because hers wasn't working. King's previous district managers allowed such expenses. In the event that King could not get a company-subsidized rental car, she asked for paid time off. King testified that Thomas denied both requests, told King "to just figure [it] out," and instructed her to come to the VHS facility in Winchester on August 31st to help present a final proposal to VHS. Jt. App'x 678.

At this time, King also needed to meet with Brittany Cubbage, Director of Food at a non-Winchester VHS facility, to work on a high-priority business proposal. Time was of the essence. Several days after the Winchester presentation, King had to deliver a company proposal for a Meals on Wheels program. To get

all her work done, King told Cubbage to report to Winchester on August 31. The two lived near each other, so Cubbage drove King to Winchester, and the two worked there. Important to this appeal, Thomas saw the two working at the Winchester site and greeted them. Thereafter, King approved Cubbage's travel reimbursement request for $56.68. King believed the reimbursement approval complied with Aramark's policy, since she instructed Cubbage to work outside of her home facility that day.

About a month and a half later, on September 18, 2017, Thomas told King that her reimbursement authorization violated company protocol and she was under investigation. The next day, King called Aramark's employee hotline to complain about Thomas's conduct.

On September 21, 2017, Thomas fired King. HR never asked King for her side of the story, nor is there evidence that HR interviewed witnesses who could corroborate King's understanding of events.

## II.    Procedural History

On January 14, 2019, King commenced this action and asserted claims of hostile work environment, sex-based disparate treatment, and retaliation under two provisions of the NYSHRL—N.Y. Exec. Law § 296(1)(a) and § 298-a—and Title VII, 42 U.S.C. § 2000e *et seq.*  Aramark filed a motion to dismiss King's NYSHRL claims for failure to state a claim, which the district court granted.  After discovery closed, Aramark filed a motion for summary judgment on King's remaining Title VII claims, which the district court also granted.  This timely appeal followed.

## DISCUSSION

## I.    King's NYSHRL Claims

The district court dismissed King's NYSHRL claim under N.Y. Exec. Law § 296(1)(a) because she did not plausibly allege a discriminatory act "within" New York within the meaning of the statute.  *See King I*, 2019 WL 3428833, at *14–15.  The court reasoned that Aramark did not hire King as a New York-based employee, and therefore, any discriminatory act did not affect employment "within" New York.  *Id.*  The district court also concluded that N.Y. Exec. Law § 298-a, which governs the extraterritorial application of the NYSHRL, did not authorize a private cause of action against a nonresident foreign corporation for

15

acts committed outside of New York. *Id.* at \*15–17. For the reasons set forth below, we affirm the district court's dismissal.

### A. Section 296(1)(a) and the "Impact Test"

King argues that the NYSHRL reaches discriminatory conduct affecting "the terms, conditions or privileges of employment . . . within" New York. Appellant's Br. 59 (quoting *Int'l Healthcare Exch. v. Global Healthcare Exch.*, 470 F. Supp. 2d 345, 362 (S.D.N.Y. 2007)). Because she received permission to work from her New York home for a significant period of time, King contends that she felt the impact of Aramark's alleged discrimination in New York. The district court disagreed. It dismissed her § 296(1)(a) claim because Aramark did not hire King as a New York-*based* employee.

Having reviewed King's complaint and New York case law, we agree with the district court's dismissal, but for different reasons. Applying New York's "impact test," we conclude that any discriminatory impact felt in the state was incidental and cannot give rise to § 296(1)(a) liability.

Section 296(1)(a) prohibits employers from firing an employee or otherwise discriminating against an employee "in [the] terms, conditions or privileges of employment" because of the employee's sex. N.Y. Exec. Law § 296(1)(a). In determining where the alleged discrimination took place, New York courts have

16

instructed that we look at "the place where the impact of the alleged discriminatory conduct is felt" to ascertain whether an employer can incur § 296(1)(a) liability. *Hardwick v. Auriemma*, 116 A.D.3d 465, 467 (1st Dep't 2014), *leave to appeal denied*, 23 N.Y.3d 908 (2014).

The New York Court of Appeals' decision in *Hoffman v. Parade Publications* is instructive. 15 N.Y.3d 285 (2010). There, an executive in New York called an employee in Georgia and said the employee would be let go by the end of the year. *Id.* at 288. The employee alleged age-based discrimination under § 296(1)(a) and sued the company. *Id.* However, the employee did not service any company accounts in New York. *Id.* Rather, he oversaw accounts in ten other states primarily located in the south and southwest. *Id.* His only connection to New York consisted of flying to the state for quarterly meetings and liaising with management personnel who were based there. *Id.*

On these allegations, the New York Court of Appeals held the employer could not be liable under § 296(1)(a). *Id.* at 289. It explained that the state legislature enacted the NYSHRL "to protect 'inhabitants' and persons 'within' [New York]." *Id.* at 291. So, to prevent an impermissible expansion of the NYSHRL to cover any plaintiff affected by a decision *from* New York that reached another state, the New York Court of Appeals adopted the "impact" test. *See id.*

17

at 290–91.  The Court of Appeals focused on the fact that the employee in *Hoffman* was not a resident of New York, did not work in New York, and had not explained how the phone call had any impact in New York.  *Id.* at 292.  Without these showings, any discriminatory act had, "[a]t most," "a tangential connection" to the state.  *Id.*  Accordingly, the New York Court of Appeals held that an NYSHRL claim premised on such allegations must be dismissed.  *Id.*

Although *Hoffman* evaluated a discriminatory act originating *from* New York, whereas King alleges discriminatory acts reaching *into* New York, we nevertheless conclude that, applying *Hoffman*'s impact test, the New York Court of Appeals would call for dismissal in this case.  When Aramark hired King to service its VHS contract, it tasked King with overseeing the company's operations in several facilities located in Virginia and West Virginia.  Aramark gave King an office in Winchester, Virginia—the location of VHS's largest facility.  Frequently, King traveled among the VHS facilities to carry out on-site work.  Because of her general manager position, King had to be available 24 hours a day, 7 days a week, to address any issues arising in these non-New York facilities.  In fact, to do her job, King had to rent a home in Virginia.  For a period, Aramark paid King mileage reimbursement from that home *in Virginia* to and between the various VHS member facilities.  Even after we draw all reasonable inferences in King's favor,

on these facts, New York's connection to King's claims is too tenuous to give rise to § 296(1)(a) liability.

The fact that Aramark permitted King to do *some* of her work from her New York residence, and *some* of the discriminatory conduct King alleges took place while she was working from her New York home office, does not change our conclusion. Her complaint reflects that Aramark authorized King to work remotely from her homes in Virginia and New York "on days that her presence at a specific facility was not required." Jt. App'x 13. Aramark extended these accommodations in part because King had to care for her ill son in New York. And much of King's work from New York took place during periods when she was on intermittent family leave. But the lion's share of the discriminatory conduct that collectively comprises King's hostile work environment claim, and her discriminatory and/or retaliatory termination was directed at her in *Virginia*, not New York. King's allegations are thus insufficient to support the inference that the impact of Aramark's allegedly discriminatory acts was felt in New York within the meaning of § 296(1)(a). Because most of the acts that comprise King's sex-based hostile work environment claim were directed at her and her work in Virginia, any impact she experienced in New York was "tangential." *Hoffman*, 15 N.Y.3d at 292.

The district court decisions upon which King relies are thus easily distinguishable. In most of the cases cited, the plaintiff's primary site of work was her home office in New York. *See Taperell v. Tegan Lighting, Inc.*, No. 18-CV-3343, 2019 WL 1118053, at *3 (E.D.N.Y. Mar. 11, 2019); *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 362; *Curto v. Medical World Communications*, 388 F. Supp. 2d 101, 107 (E.D.N.Y. 2005). And in *Bass v. World Wrestling Federation Entertainment*, the district court held that the plaintiff could only pursue her claims based on discriminatory actions undertaken *within* the state. 129 F. Supp. 2d 491, 505–06 (E.D.N.Y. 2001). These cases do not alter our assessment.

*B. Section 298-a and Extraterritorial Liability*

We likewise reject the suggestion that § 298-a, the NYSHRL provision addressing extraterritorial conduct, authorizes King's claim. The Appellate Division, First Department, of the New York State Supreme Court has held on at least three occasions that § 298-a "does not provide a private cause of action to New York residents discriminated against outside of New York by [non-New York] corporations." *Sorrentino v. Citicorp*, 302 A.D.2d 240, 240 (1st Dep't 2003); *see also Hardwick*, 116 A.D.3d at 466 (1st Dep't 2014); *Esposito v. Altria Grp.*, 67 A.D.3d 499, 500 (1st Dep't 2009), *leave to appeal denied*, 15 N.Y.3d 701 (2010); *see also Hoffman*, 15 N.Y.3d at 292 (explaining that § 298-a allows New York residents to "bring a

20

claim against *New York* residents and corporations who commit unlawful discriminatory practices outside the state") (emphasis added). The parties have not identified, and we have not found, any other Appellate Division decisions suggesting otherwise. Absent "persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion," we are bound to apply the NYSHRL's extraterritorial provision as interpreted by the First Department. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 221 (2d Cir. 2003).[3]

Here, Aramark is a Delaware corporation with its principal place of business in Pennsylvania. Thus, even assuming that King is a New York resident, § 298-a(3) does not authorize King's private action seeking damages for Aramark's alleged discriminatory acts outside of New York.

---

[3] Two other panels of this Court have reached the same conclusion. *See Shin v. American Airline, Inc.*, 726 F. App'x 89, 90 (2d Cir. 2018); *Harte v. Woods Hole Oceanographic Inst.*, 495 F. App'x 171, 172 (2d Cir. 2012).

**II. King's Title VII Claims**

Considering the record evidence, we conclude that the district court erred in granting Aramark summary judgment on King's Title VII claims of sex-based hostile work environment, sex-based discrimination, and retaliation.

*A. Sex-Based Hostile Work Environment*

The district court concluded that King's claim was time-barred because (1) all the events contributing to King's hostile environment occurred more than 300 days before she filed her discrimination charge with the Equal Employment Opportunity Commission (EEOC), and thus, (2) King could not benefit from the "continuing violation doctrine."

We take a different view. We conclude that a reasonable factfinder could find that at least one act furthering the discriminatory pattern or practice of hostile treatment occurred within the limitations period, the continuing violation doctrine thus applies, and King's harassment claim was timely. In reaching this conclusion, we consider the distinction between a hostile work environment claim and a discrete act claim for purposes of accrual, the application of the continuing violation doctrine where a discrete act is also part of the ongoing discriminatory pattern or practice, and the application of these principles to the evidence in the summary judgment record.

### i. Discrete Act vs. Continuing Violation Claims

Under Title VII, plaintiffs must file a charge with the EEOC "within 180 [days] or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)).

In *National Railroad Passenger Corporation v. Morgan*, the Supreme Court explained that the word "practice" in Title VII generally refers to "a discrete act or single 'occurrence.'" 536 U.S. 101, 111 (2002). Examples of discrete acts include terminating employment, failing to promote, denying a transfer, and refusing to hire. *Id.* at 114–15. Because a discrete discriminatory act is individually actionable and "occurs" on the day that it "happened," the 300-day limitations period begins running on the day of each occurrence, meaning each discrete act claim carries its own 300-day limitations period. *Id.* at 110.

The "continuing violation doctrine," however, creates an exception to the 300-day rule. *Banks*, 81 F.4th at 259. Under the doctrine, if "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice, a continuing violation may be found." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713

23

(2d Cir. 1996). Claims of a discriminatory hostile work environment are subject to the continuing violation doctrine because the "very nature" of a hostile environment claim "involves repeated conduct," and "incidents that give rise to a hostile work environment 'occur over a series of days or perhaps years and a single act of harassment may not be actionable on its own.'" *Banks*, 81 F.4th at 259–60 (quoting *Morgan*, 536 U.S. at 115; *see also Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts.")). Because a constellation of events over time can collectively give rise to a hostile environment claim, if "an act contributing to the [hostile environment] occurs within the filing period," the hostile work environment claim is timely, and a factfinder can hold a defendant liable for "the entire time period of the hostile environment," including the period falling outside of the limitations period. *Morgan*, 536 U.S. at 117.

In light of these differences, an untimely discrete act claim cannot be pulled into the limitations period by a claim premised on a continuing course of conduct, even if the course of conduct includes that discrete act. *See Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004). For example, if a Title VII plaintiff lodges a timely hostile work environment claim against an employer, the plaintiff cannot also lodge a separate claim for a discrete failure to promote if the promotion denial fell outside the limitations period. *Morgan*, 536 U.S. at 113–14. The plaintiff can

24

use the promotion denial as evidence to support *the hostile work environment claim*, but the continuing violation doctrine does not render timely a distinct *discrete act claim* for damages based on the promotion denial. *See id.* at 113.

ii.  Discrete Acts as Part of the Discriminatory Pattern or Practice

While it is clear that a timely hostile environment claim cannot make an untimely discrete act actionable, neither we nor the Supreme Court have held that the converse is true. When the Supreme Court described discrete act *claims* as "different in kind" from hostile work environment claims, it did not suggest that the same discrete act could not support both kinds of claims if it is demonstrably part of the course of discriminatory treatment that comprises the hostile environment claim. *Morgan*, 536 U.S. at 115. And we have never held that a discrete act that furthers a discriminatory policy and occurs within the limitations period cannot render timely a hostile environment claim based upon that policy. Today, we make it clear that such a discrete act can do so.

In *Patterson*, we hinted that a timely discrete act that also furthers a pattern-or-practice claim might render the pattern-or-practice claim timely. 375 F.3d at 220. There, Patterson alleged that his employer had created a race-based hostile work environment and that he was terminated on the basis of his race. *Id.* at 211. The only allegedly discriminatory act Patterson identified within the 300-day

25

period was the termination of his employment. *Id.* at 220. We noted that Patterson had presented "no evidence" that the termination, "even if discriminatory, was in furtherance of the alleged practice of racial harassment," and thus affirmed the district court's dismissal of Patterson's hostile work environment claim as untimely. *Id*. Our analysis in *Patterson* suggests that if Patterson *had* presented evidence that his termination *did* further the ongoing hostile practice, it would have pulled the hostile environment claim into the limitations period.

In a closely related context, the First Circuit has held as much. *See Fincher v. Town of Brookline*, 26 F.4th 479, 486 (1st Cir. 2022). Applying the continuing violation doctrine to a discrimination claim under 42 U.S.C. § 1983, the court concluded that because one act—Fincher's termination—occurred within the limitations period, and because that termination was "part of the same unlawful employment practice as the . . . earlier actions (racial discrimination in connection with [Fincher's] injuries and job assignments)," Fincher's claim for an ongoing pattern of discrimination was timely. *Id*. At the same time, the court recognized that "to the extent that the Town's pre-termination actions formed the basis of Fincher's termination," the court could "also consider them as background evidence in support of a timely claim, though they are not independently actionable." *Id*. n.2. In other words, Fincher's termination could be *both* a discrete

26

act supporting a timely claim for damages *and* an element of a continuing course of discriminatory conduct that, through the continuing violation doctrine, renders the discriminatory-course-of-treatment claim timely.

We hold that this same principle applies in Title VII cases: A discrete discriminatory act, such as termination, within the limitations period may not only support a claim for damages, it may also render a hostile work environment claim timely *if it is shown to be part of the course of discriminatory conduct that underlies the hostile work environment claim*.

Our holding is consistent with how hostile environment claims work. As noted above, an employer can create a hostile environment through a series of discriminatory occurrences that transpire over days and years. Discrete acts like a promotion denial, though untimely for purposes of a separate discrete act claim for damages, can nevertheless help a plaintiff prove a hostile environment claim. *Morgan*, 536 U.S. at 113. That's because a hostile environment is formed and shaped by an assemblage of discriminatory acts—*including* acts that might *also* support a discrete-act discrimination claim if timely filed. That's true whether the discrete acts that are part of a discriminatory course of conduct occur within the limitations period or without. There's no exception to the continuing violation

doctrine for timely acts that are also discrete acts that could support separate claims for damages.

We emphasize one limitation to our holding: The continuing violation doctrine allows a Title VII plaintiff to rely on a discrete act to render a hostile environment claim timely *only* if the plaintiff establishes that the discrete act was part of the ongoing, discriminatory practice that created a hostile work environment. *See Patterson*, 375 F.3d at 220. An unrelated discrete act, different in kind from the conduct giving rise to the hostile environment, does not trigger the continuing violation doctrine.

### iii. Application to King's Hostile Environment Claim

Here, to establish a timely hostile environment claim, King must show a qualifying act no earlier than September 20, 2017.[4] King has identified two instances of ongoing hostile conduct that fall within the limitations period— Thomas's involvement in an HR investigation and his firing of King.

With respect to the first, the time period between King's call to the employee hotline and her termination two days later fell within the limitations period. On

---

[4] We need not decide whether the 300-day period ended on July 17, 2018—the date King's counsel said the complaint was hand-delivered to the EEOC, or July 18—when it was stamped as "received." *See King II*, 2022 WL 1460238, at *13, *15. Our conclusion would be the same either way.

September 18, 2017 (which fell outside the limitations period), King met with Thomas and an HR representative to discuss how she could improve her performance. Instead of exploring this matter, Thomas told King that she was under investigation for her purported reimbursement violation. King called Aramark's employee hotline the next day (which fell within the limitations period), and two days after that, Aramark fired King.

The record reflects that during the limitations period, nobody interviewed King or any other witnesses besides Thomas. The investigation report also relied heavily on Thomas's version of events. If a jury credits this evidence, it could find that Thomas misdirected the HR investigation. And, given that Thomas had fabricated performance issues outside the limitations period, kept a "legal file" on King since at least 2016, and had a termination letter prepared before the events giving rise to King's termination, a reasonable jury could infer that Thomas's interference was a continuation of his hostile treatment of King. Therefore, Thomas's interference, which fell within the limitations period, made King's hostile work environment claim timely.

For similar reasons, on this record, a jury could conclude that King's termination was part of an ongoing discriminatory pattern or practice of sex-based harassment. As we said above, a discrete act that contributes to a hostile work

environment and falls within the limitations period allows a factfinder to consider "the entire time period of the hostile environment . . . for the purposes of determining liability." *Patterson*, 375 F.3d at 220. Here, a reasonable jury viewing the facts in the light most favorable to King could find that Thomas played a decisive role in King's termination. A jury could also find Thomas's decisive role contributed to his long-running enterprise of subjecting King to a pervasive, hostile work environment. Thus, unlike *Patterson*, this record includes *some* evidence that King's firing was part of the same discriminatory pattern or practice of mistreatment from Thomas that underlay her hostile work environment claim. *Cf. McGullam v. Cedar Graphics*, 609 F.3d 70, 78 (2d Cir. 2010) (noting that the same harassing acts by the same harasser are more likely to be part of the same actionable hostile environment claim).[5] King can therefore avail herself of the continuing violation doctrine, and her sex-based hostile work environment claim is not time-barred. The district court erred accordingly when it granted summary judgment for Aramark.[6]

---

[5] For the reasons stated by the district court, we agree that an email between Thomas and the regional HR director within the limitations period did not constitute part of a continuing violation. *See King II*, 2022 WL 1460238, at *15.

[6] On appeal, Aramark does not expressly challenge King's hostile environment claim on any other basis.

## B. Sex-Based Discrimination – King's Termination[7]

Based on the summary judgment evidence, a jury could also find that Aramark fired King on the basis of her sex. We apply the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under the *McDonnell Douglas* framework, King must make a *prima facie* case (an initial showing) of sex-based discrimination. *Banks*, 81 F.4th at 270. This initial burden is a "minimal" one. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019). Once King satisfies this minimal burden, the burden shifts to Aramark to articulate a legitimate, non-discriminatory reason for firing King. *Id.* If Aramark does so, the burden shifts back to King, who must then show that Aramark's purportedly legitimate reason for firing her was pretextual for sex-based discrimination. *Id.* at 107–08. We conclude that King has presented sufficient evidence to make her initial showing of discrimination and to establish pretext.

---

[7] Although King's complaint identifies numerous potential adverse employment actions, her brief on appeal focuses only on her termination. Accordingly, any sex discrimination claims based on other alleged adverse employment actions are waived. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995).

####### i.    Initial Showing

To make her initial showing, King may rely on direct evidence of sex-based discrimination or point to "circumstances giving rise to an inference of [sex-based] discrimination." *Banks*, 81 F.4th at 270. "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside [the plaintiff's] protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. County of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010). To make this *prima facie* showing, there must be "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id*. at 494.

Here, in light of Thomas's differential treatment of King as compared to her similarly situated male peers, a rational trier of fact could infer that Thomas's adverse treatment of King was based on her sex.

We reject Aramark's argument that no reasonable factfinder could conclude that King's peers were similarly situated for purposes of the various instances of differential treatment that she cites. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "[W]e [have] made it clear that this rule does not require a precise identicality between comparators and the plaintiff." *Matusick*

*v. Erie County Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014). "[F]or such evidence to be probative, and therefore to support a jury verdict, there must only be an objectively identifiable basis for comparability." *Id.*

To support an inference of sex-based discrimination, King points to four male colleagues who also reported directly to Thomas. These comparators serviced different Aramark contracts, managed different numbers of facilities, and the facilities themselves were often smaller than King's VHS facilities. Although none of these male peers was *identically* situated to King, they nevertheless had similar titles to King, had similar responsibilities, and directly reported to Thomas. We conclude that these male direct reports shared enough commonalities with King that they can serve as adequate comparators. True, King managed a larger institution with more sites of service than some of her male peers. But this difference and the others pointed out by Aramark are not so significant that they would preclude a jury from viewing her differential treatment as evidence of sex-based animus.

For example, the record indicates that Thomas gave Christopher Harriman, a male direct report to Thomas, proper office space, but did not do so for King. For an internal program, Thomas required King to meet certain deadlines, but he said "it was fine" if Harriman did not satisfy the same requirements for the same

33

program. Jt. App'x 1124. Thomas also required King to obtain approval for all financial decisions involving sums greater than $1,000—an extremely burdensome expectation, given that King oversaw millions in business annually. Thomas did not micromanage Harriman or any other male direct report in the same way. Aramark may have persuasive explanations for these disparities, but King and Harriman are not so dissimilarly situated that a reasonable jury could not infer that the disparate treatment evidences sex-based animus. Deciding whether the two were "similarly situated" for purposes of evaluating Thomas's treatment of them is a fact-intensive task that should be left to the jury.

Additionally, we cannot say that Thomas's weight-related comments and frequent stares, combined with the other differential treatment recounted in our factual recitation above, cannot give rise to an inference of sex-based animus. The district court discounted the body shaming evidence marshaled by King, reasoning that King's interpretation of the evidence amounted to an impermissibly speculative "gendered gloss." *King II*, 2022 WL 1460238, at *17. But in so ruling, the district court erroneously assessed the strength of King's summary judgment evidence. It should have entrusted this job to the jury.

Our Court has said that gender-based comments can serve as evidence that gender played an impermissible role in an adverse employment decision. *Back v.*

34

*Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004).   And a reasonable jury could conclude that Thomas's singling out of King for weight-related remarks and conduct—remarks and conduct that he did not direct toward her male peers—reflected not only a bias against individuals with certain body types, but also a gender-based bias.[8]   *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . .").   The district court erred when it concluded that, as a matter of law, King's body shaming evidence could not contribute to meeting her *prima facie* burden.

---

[8] Such a conclusion would be neither novel nor impermissibly speculative.  *See* Jay M. Zitter, *Employment Discrimination Against Obese Persons*, 111 AM. JUR. PROOF OF FACTS 3d 391 (Feb. 2024) ("[W]omen suffer from weight discrimination in far greater numbers than men in part because the societal standard for overweight women is more severe than for men and in part because women are employed in positions where, it is asserted, 'looks matter.'"); Lauren E. Jones, Note, *The Framing of Fat: Narratives of Health and Disability in Fat Discrimination Litigation*, 87 N.Y.U. L. REV. 1996, 2004 nn.27, 35 (2012) (citing studies suggesting that weight bias may help explain pay differentials between male and female employees); Michael T. Owyang & E. Katarina Vermann, *Worth Your Weight?  Re-Examining the Link Between Obesity and Wages*, FED. RESERVE BANK OF ST. LOUIS (Oct. 1, 2011) (exploring how the weight-wage penalty experienced by men and women employees differ), https://perma.cc/3MGS-HADF.

### ii. Legitimate, Non-Discriminatory Reason

At the second step of the *McDonnell Douglas* burden-shifting framework, Aramark must articulate a legitimate, non-discriminatory reason for firing King. *Banks*, 81 F.4th at 270. Here, Aramark claims it fired King because she violated its reimbursement policy when she authorized Cubbage to recover travel-related costs after she drove King to the Winchester facility. According to Aramark, Cubbage merely dropped King off in Winchester and left to report to her own duty station. So, when King approved Cubbage's request for mileage reimbursement, the authorization essentially covered the expense of King's normal commute. Aramark thus articulated a legitimate, non-discriminatory reason for firing King: she violated the company's reimbursement policy. Aramark's proffered reason for firing King satisfies its burden.

### iii. Pretext

To show pretext, a plaintiff can point to "weaknesses, implausibilities, inconsistencies, or contradictions in" an employer's offered reason for its adverse action. *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Also probative are whether the employee believed the conduct was permissible and any procedural irregularities. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89 (2d Cir.

2019) (employee's belief); *Stern v. Trustees of Columbia University in City of N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997) (procedural irregularities).

Although Aramark claims King violated its reimbursement policy, King counters that Cubbage drove to Winchester because King instructed her to do so to help with a specific project. Cubbage worked that day at the Winchester facility. In fact, Thomas saw King and Cubbage working in an office and greeted them. King's personal observations contradict the investigation's findings on this point and support her view that because she directed Cubbage to work away from her main duty station that day (which King had authority to do), Aramark policy permitted the mileage reimbursement and there was no violation.

King also contends that the HR director deviated from typical procedures for properly investigating alleged misconduct. Had the director completed a more thorough investigation, she would have heard King's version of events, and perhaps King would not have been fired. And as noted above, King also produced evidence that Thomas had drafted a letter to terminate her employment even *before* the travel expense issue arose, suggesting the infraction provided a pretext to terminate King.

On this record, King has created a genuine dispute as to whether the purported reimbursement infraction was a pretext to terminate her for discriminatory reasons.

### C. Retaliation

As with sex-based discrimination claims, Title VII retaliation claims are also evaluated under the *McDonnell Douglas* framework. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). On appeal, Aramark does not challenge the district court's conclusion that King made an initial showing of unlawful retaliation in connection with her termination. Aramark only argues that King has not presented sufficient evidence to show its legitimate, nondiscriminatory reasons for terminating her were pretextual.

For the same reasons stated for King's sex-based discrimination claim, we reject Aramark's pretext argument with respect to King's retaliation claim. In addition, the temporal proximity between King's hotline complaint and termination (two days) and King's belief that her actions were proper could bolster a finding of pretext and retaliatory animus. *See Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (temporal proximity); *Bentley*, 935 F.3d at 89 (employee's belief).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court dismissing King's NYSHRL claims. We **VACATE** the judgment of the district court with respect to King's Title VII claims and **REMAND** for further proceedings consistent with this opinion.